1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

WRIGHT AND OTHERS v. TRUSTEES OF THE CORP. OF METH. EPIS. CHURCH IN THE CITY OF NEW-YORK, AND OTHERS.

LEGACIES were given to "my second cousins, Archibald, Euphemia, "Mary, and Nancy, children of George Murray, *or to their heirs*, "$500 each, with provision that, in case of the death of either of "them before they should arrive at lawful age, and without issue, "their shares should be divided equally among the survivors, or "their heirs." Euphemia was dead at the date of the will, leaving children, and assumed to be over twenty-one years of age. Held, that the words *or to their heirs*, prevented a lapse. Had it been *and* to their heirs, it would have been different; a transmission through the legatee being implied.

Held, also, that as the gift was of personal property, the term heirs means such persons as the law points out to succeed to personal property. That the children did not take by special designation, nor technically as heirs, but as next of kin; next of kin being heirs as to personal estate. That the father was excluded. He never took *jure mariti*, as the legacy never vested in the wife, and a husband in legal strictness is not next of kin to his wife. The phrase *next of kin*, when used *simpliciter*, does not mean those entitled under the statute of distributions, but the next in blood.

Pecuniary legacies were given to various institutions. Upon a citation before the surrogate, the executors' accounts were finally settled, and sentence pronounced. The legacies were therein stated as paid. Held, that this sentence was final on all who were legally competent and were cited; was pleadable in every court, and the only remedy was an appeal under the statute. That the phrase of the act, (2 *R. S.*.p. 94, § 65,) that the settlement shall be conclusive evidence of the charges for monies paid *being correct*, includes the validity of a debt, or the right of a legatee, as well as the fact of payment.

The 66th section of the act, extends only to the few cases of express trusts now permitted.

*Quære*, if the sentence is final on infants, or those under disability, bound only by publication?

A surrogate is authorized to make a decree for the distribution of the proceeds of real estate sold under a power given in the will, although the sale took place before the statute of 1837. (*Laws* 1837, p. 537, § 75.)

A will gave various pecuniary legacies, some to individuals, and others to charitable and religious institutions, and then directed

and authorized the executors to sell all the devisor's real estate, to collect all monies due him on bond and otherwise, and with the proceeds to pay the foregoing legacies. And after providing that, if there was a deficiency of funds to pay all his monied legacies, an abatement should be made upon those given to the institutions before enumerated, it directed as follows: "And "should there be a surplus of my estate, after paying all my mo-"nied legacies, I give the same to the above named institutions, "to be paid to them proportionally."

1839.

Wright and others
v.
Trustees of Meth. Epis. Church.

The real estate was sold, and out of the mingled proceeds from that, and the personal property, the legacies were discharged. There was a considerable surplus. Held, that the court does not marshal the assets in favor of charities, and could not consider the whole surplus as the proceeds of personal estate. That if·the devise of the surplus was void, the apportionment should be made by taking the aggregate fund resulting from both estates, and the amount derived from the real estate, and thus ascertaining the proportion of the surplus which could not pass.

The question of the validity of the residuary devise examined on the assumption that the whole surplus arose from real estate.

Held, that the devise was direct to the societies; and that the authority to sell, was a general power in trust. Held also, that it was not a case of equitable conversion, so that the land must be treated as money from the death of the testator.

The doctrine of equitable conversion examined as to a change of real into personal estate, and the results, where it takes place, stated as to the transmission of the estate.

To establish a conversion, the will must direct a sale absolutely, or out and out; for all purposes, not merely those of the devise; irrespective of contingencies, and independent of all discretion. If the sale is to be made for the purposes of the will, and those fail, there is no conversion.

Held, that the devisor in the principal case, although he had plainly shown an intention to convert the property into money, had equally shown that it was for the purposes of the will; and the will did not show that he meant the sale should be made, even if those purposes could not take effect. The leading case of *Achroyd* v. *Smithson* applied to the present; and the conclusion drawn, that there was here no such conversion as would have changed the course of transmission in case the residuary devisees were natural persons, and one of them had died in the life of the testator.

Held also that as there would have been no conversion for the purposes of transmission, there could be none in favor of charitable institutions.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

The question of the legality of the residuary bequest examined. A right to the surplus after a sale is separable and distinct from a right to the interim rents. If the gift of the surplus was void, the rents could not pass; but it did not follow that if such gift was valid, the rents also vested in the societies.

A devise to a corporation of any estate or *interest* in land which is descendible, is void by the statute of wills. But although whatever is descendible is now devisable, yet the power to devise is not limited to descendible interests. An estate *pur auter vie* is now personal assets, yet may be devised under the term *lands.*

A power to sell lands may be devised, and a power given to a corporation to sell for the use of others, is void within the exception of the statute.

The change in the present statute of wills examined as to whether it is more prohibitory than the exception in the former act. Under that, a devise to trustees for a corporation was valid, and also a devise to sell lands and pay over the proceeds. Held, that notwithstanding the probable views of the revisers, the present statute has not varied the rule and exposition of the old act. That the exception in the latter was as operative a prohibition as the provision of the new. And that the statute of wills alone does not avoid a devise to a competent person for a corporation, nor preclude it from taking the avails of land devised to such person to be sold. But under the statute of uses and trusts, if a devise is made to a person to receive the rents and pay them to the corporation, or for its use, (which would not be one of the permitted trusts) the interest or estate would vest directly in the corporation, and thus be void. This would be the inevitable result in the case of corporations generally. *Quære,* if there is any exception of charitable corporations? It appears that the 56th section of the statute of uses applies to a naked power given to executors to sell, as well as to a devise directly to them to sell, which is converted by the section into a power in trust, they not being entitled to the rents. Hence, that the interim rents and profits vested in the devisees, and a right to the possession and an interest in the land till a sale vested in them, not in the heir; and such an interest could not be given under the statute of wills. *But held,* that it was only this intermediate estate or interest which was avoided. That the interim rents passed to the heir at law. And that the right to the proceeds upon a sale, was a right separable from the void interest, and was not rendered invalid by its illegality.

*Held,* also, that the cases upon the statute 9 Geo. II. cap. 36, do not

control the construction of our statute of wills. The difference in the provisions stated.

One of the legacies was "to the Methodist Society that meet in "the meeting-house in John-street." The corporate style of the claimants was: "The Trustees of the Corporation of the Metho- "dist Episcopal Church in the City of New-York." There were eleven churches composing the Society, and that in John-street was one. Held, that payment to the secretary or clerk of the separate church, if there was any such officer, was good, or a payment to the treasurer of the general board expressly for its use. Held, also, that this corporation can take land directly under the act of 1784. That this act authorizes subsequent acquisitions, but does not sanction previous gifts by devise.

One of the legatees of the residue was "the yearly meeting of "Friends in New-York." This was a voluntary unincorporated society ; and was proven to be composed of members of the society of Friends living in Vermont, New-York, part of Massachusetts and Upper Canada.

*Held*, that the bequest was valid, and payment could be made to the treasurer or clerk in office at the time.

The law of charitable uses examined. Its origin and history in the civil law and in England. The statute of Elizabeth and the decisions in our own country observed upon.

The heir at law being incapable of taking the rents accrued prior to the sale by reason of alienism, they escheated, and were directed to be paid in such manner as the attorney general should direct.

THE bill in this cause was filed by the executors of Archibald Campbell, for the purpose of obtaining the direction of the court as to the distribution of the surplus funds of the estate of the testator in their hands.

On the 27th day of August, 1830, Archibald Campbell made his last will and testament, duly executed, and on the 18th of February, 1832, he executed a codicil thereto. It is deemed expedient to state parts of both at length.

I, Archibald Campbell, of the city of New-York and county of New-York, mariner, do make and publish this my last will and testament, manner and form following, that is to say :

First I order and desire my executors hereinafter named to pay all my just debts, funeral expenses, and a charge

*Margin notes:*
1839.
Wright and others
*v.*
Trustees of Meth. Epis. Church.

Sept. 18, 19. Oct. 7th.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

of proving and executing this my last will, as soon after my decease as can conveniently be done.

Item, I give and devise to my second cousin Alexander Campbell, his heirs and assigns forever, my north-east farm as the division line between my two farms now runs.

Item, I give and devise to my second cousin Jeanette Miller, and to her heirs forever, my south-east farm as the division line between my two farms now runs, situate in the town of Monroe and county of Orange.

" Item, I give and bequeath to Thomas Everit, trea-
" surer of the New-York Yearly Meeting of Friends, or to
" his successor or successors duly appointed by said meet-
" ing, five thousand dollars in trust for the use of said
" meeting, two thousand five hundred of which to be ap-
" propriated for the schooling of children, the other two
" thousand five hundred dollars to be appropriated by said
" meeting for building, buying, or repairing friends meet-
" ing houses."

Then follow certain pecuniary legacies.

" Item, I give and bequeath to my second cousins, viz.
" Archibald, William, Euphemia and Nancy, children of
" George Murray; also Alexander, Archibald, Charles, Jea-
" nette Bell and Margaret, children of Duncan Campbell ;
" also Daniel, Archibald, Jeanette and Nancy, children of
" ———— McFail, (fifteen in number,) or to their heirs, five
" hundred dollars each.   In case of the decease of either
" of the above children of George Murray, before they
" arrive at lawful age, and without issue, I order and
" direct his or her proportion or share divided equally
" amongst the survivors or their heirs, the same with the
" above named children of Duncan Campbell, and the
" same with the above named children of McFail."

" Item, I give and bequeath to Samuel Seaman, and his
" heirs five hundred dollars in trust, to be applied for the
" purpose of assisting the religious society of Friends in
" building a new meeting-house at the Clove in the town
" of Monroe, Orange county."

" Item, I give and bequeath to Christopher Prince, sec-
" retary of the Marine Society, and to his successor or

"successors in that office, five hundred dollars in trust, to
"be applied for the benefit of the Marine Society of New-
"York, at its discretion."

"Item, I give and bequeath to Benjamin Hilton and
"Valentine Hicks, or the survivors of them, five hundred
"dollars in trust, and I hereby order and desire the said
"trustees, or the survivor of them, to pay over the said
"five hundred dollars to the Methodist Society that meet
"in the meeting-house in John-street, New-York, to be
"applied to the use and benefit of said Society at its dis-
"cretion.

"Item, I give and bequeath to Robert Hicks, five hun-
"dred dollars in trust, and I do hereby order and desire
"the said trustees to pay over the said five hundred dol-
"lars for the use and benefit of the House of Refuge in
"New-York for juvenile offenders."

"Item, I give and bequeath to Christopher Prince and
"Samuel, five hundred dollars to be applied for the use
"and benefit of the Society for the Promotion of the Gos-
"pel among Seamen in New-York, at its discretion.

"Item, I give and bequeath to Samuel Hicks and David
"S. Brown, or the survivors of them, five hundred dollars
"in trust, and I order and direct the said trustees, or the
"survivors of them, to pay over the said five hundred dol-
"lars to the New-York Society for the Manumission of
"Slaves, and for protecting such of them as have been or
"may be liberated to be applied for the use and benefit of
"said Society, at its discretion."

"I hereby authorize and direct my herein after named
"executors, to sell all my real estate, collect all monies due
"to me on bond or otherwise, and with the proceeds arising
"therefrom, to pay the foregoing legacies.

"Also it is my will and desire, that in case my estate
"shall not be sufficient to discharge all my monied legacies
"herein before mentioned, to deduct in equal ratio from the
"legacy I have given Thomas Everit, for the use of the
"yearly meeting of Friends in New-York, also from the
"legacy given to Samuel Seaman in trust, to build a meet-
"ing-house in Clove, also from Christopher Prince, for the

*1839.*

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

" Marine Society, also to Benjamin Hilton and Valentine " Hicks, for the use of the Methodist Society, also to Robert " Hicks, for the use of the House of Refuge, also to Christo- " pher Prince and Samuel Hicks, for the Society for the Pro- " motion of the Gospel among Seamen, also to Samuel " Hicks and David S. Brown, for the Manumission Society " of New-York, *and should there be a surplus of my estate* *" after paying all my monied legacies, I give the same to* *" the above named institutions, to be paid to them propor-* *" tionally.*

On the 18th of February, 1832, a codicil was made to this will, in which, among other things, was the following clause :

" Whereas I did also give and bequeath to Thomas " Everit, treasurer for the New-York Yearly Meeting of " Friends, or to his successor or successors, five thousand " dollars in trust, for the use of said meeting, two thou- " sand five hundred dollars to be appropriated to the " schooling of children, and the remaining two thousand " five hundred dollars, to be appropriated by said meeting " for building, buying or repairing Friends meeting-houses, " which I now annul and make void.

" Item, I give and bequeath to Thomas Everit, treasurer " of the Monthly Meeting of New-York, or to his successor " or successors, duly appointed by said meeting, five thou- " sand dollars in trust, two thousand five hundred dollars of " which to be appropriated for the schooling of children un- " der the care of the Monthly Meeting aforesaid, and the re- " maining two thousand five hundred dollars, to be appro- " priated for other purposes, as the meeting of New-York " may direct."

The testator died in the month of February, 1832, and the will was proved in April, 1832.

The executors having applied to the surrogate for the purpose of passing their final account, citations issued in the usual manner, and on the 2d of September, 1834, a final order was made, in which, after reciting that citations had been issued, requiring the personal attendance of the heirs, legatees, and next of kin of the said Archibald Campbell,

deceased, before the said surrogate, to attend the final accounting and settling of all the proceedings of the said executors aforesaid, pursuant to the statute in such case made and provided, and that due proof of the service and publication of such citations had been made and filed, and the said executors had attended on the day mentioned in said citations for that purpose, and on days subsequent thereto, to which the said accounting was adjourned, and rendered such final account of all their proceedings as executors as aforesaid, with vouchers therefor, by which it appeared that the said executors, after having sold all the real and personal estate of the said testator, ordered or permitted by the said will to be sold, and paid all the debts of the testator, and the legacies specifically ordered by the said will to be paid, excepting the legacies given by said will severally to Euphemia Murray, Nancy McPhail, Archibald Campbell, Nancy Murray, and Margaret Campbell, of five hundred dollars, which legacies still remain unpaid, amounting in all to the sum of two thousand five hundred dollars, there remained in the hands of the said executors a surplus, arising from the sale of the said real and personal estate, and the products thereof, the sum of thirteen thousand eight hundred and seventy-seven dollars, seventy-five cents, besides the rents of the real estate, which the said executors received, arising from the real estate of the said testator, before a sale thereof by the said executors, and over and above the said sum of twenty-five hundred dollars, retained by them to pay said legacies, and the same had been examined, and due deliberation thereupon had. It was thereby ordered, and the said surrogate, by virtue of the power and authority in him vested, did thereby allow and confirm the said final account of said executors, and the settlement thereof, and finally settled the same, and declared that the said sum of thirteen thousand eight hundred seventy-seven dollars and seventy-five cents, as the true balance or surplus of the estate of the said testator, remaining in the hands of the executors, as therein before stated, exclusive of the said unpaid legacies and rents of the real estate as aforesaid. And it having been suggested,

1839.

Wright and others
v.
Trustees of Meth. Epis. Church.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

and having appeared to the said surrogate, that difficulty would arise in the distribution of such surplus, and that the honorable the court of chancery, would be the more competent tribunal to direct the same, it was further ordered, that the said executors might withdraw so much of their application for their final accounting, as related to the distribution of the surplus estate of the said testator, remaining in their hands as aforesaid, and they might be permitted to apply to the court of chancery for directions in the premises."

By an abstract of the accounts handed in, it appeared that the whole amount of the pecuniary legacies bequeathed was $32,000, exclusive of those to the societies, or in trust for them; and the legacies to the societies amounted to the sum of $7,500 ; the proceeds of the real estate were $32,700 50; the personal property, after deducting expenses and debts, was $20,677 25. The executors sold all the real estate by the 8th day of December, 1832, and satisfactory reasons are given for their delay. The balance of rents collected by them between the death of the testator and the sale of the real estate, is $1,541 72. The fund in hand, exclusive of the rents, is $13,877 75.

*Mr. J. Miller*, for the complainants.

*Mr. Cosby* and *Mr. Kent*, for the public administrator.

*Mr. James Smith*, for Archibald and Alexander Campbell, and Samuel Seaman.

*Mr. Lord*, for the Marine Society, the Methodist Episcopal Church, and the House of Refuge.

*Mr. Jay*, for the Manumission Society.

*Mr. Griffin*, for the Monthly Meeting and the Yearly Meeting of Friends.

THE ASSISTANT VICE-CHANCELLOR :—The questions in this cause may be discussed under the following heads—

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

1st. As to the legacy to C. A. Macy, one of the executors, 2d. As to the legacy of $500, given in the will to Euphemia Murray. 3d. As to the validity of the gifts to such of the institutions as are incorporated, and are described by their corporate style, or with such slight variations as not to affect the certainty of the designation. 4th. In relation to the claims of those corporations, which it is contended are not defined with reasonable certainty in the will as intended to take. And *lastly*, in relation to the bequest to the Friends Monthly Meeting, and the Friends Yearly Meeting, unincorporated societies.

1st. The legacy to Macy, who was a witness to the will, was paid by the executors, and charged in their accounts passed by the surrogate. I consider that the final decree of that officer has settled this question, and that it cannot be opened in this suit by the parties now litigating. I shall have hereafter occasion to state fully my reasons for this conclusion.

2d. As to the legacy to Euphemia Murray. The language of the testator is this: "I give and bequeath to my " second cousins, viz., Archibald, Euphemia, Mary, and " Nancy, children of George Murray, or to their heirs, $500 " each." Upon the death of either of them under age and without issue, there was a bequest over. Euphemia Murray was dead at the date of the will, leaving children, and probably was over twenty-one years of age at that time. I do not consider this of any consequence. As she died leaving children, the bequest over to the survivors of the designated class, could not take effect. For that purpose the two events, viz., of her death under age and without issue, were to concur.

It is indisputable, that if the legacy has lapsed, the residuary legatees will take, if capable of taking at all. It is personal property. The question then, whether there is a lapse depends upon the force of the phrase, *or to their heirs*. I am satisfied that these words prevent a lapse. It is true, that there is a class of cases showing that there must be not only a declaration that there shall not be a lapse, but words designating personal representatives su-

peradded to the name of the legatee. (See the cases in *Ward on Legacies*, pages 166, 167.) These cases, however, are all distinguishable from the present, because in them the gift is with the copulative "and," viz., to the legatee *and* his representatives. A transmission through the legatee is implied. And again, in such cases, the legatee died after the will. Here the word "*or*" is used, and the legatee was dead at the date of the will.

The question remains to whom the gift shall go ; whether to heirs at law as if it were real estate ; to the children, or to their father under the statute of distributions.

The term *devisee* accompanying a bequest of personalty will be held to mean *legatee*. (*Coope* v. *Banning*, 1 *S. & St*. 534.) In the case of *Holloway* v. *Holloway*, (5 *Vesey*, 399,) the Master of the Rolls said, that he was glad to be relieved from the necessity of stating who are meant by the words *heirs at law* as to the property the subject of the bequest. That it was personal property. And it is said, though the phrase " heirs, &c.," has a definite sense as to the real estate, yet as to the personal estate it must mean such person as the law points out to succeed to personal property. That he was much inclined to think so. He thought that if he was under the necessity of deciding the point he should hold that it was heirs *quoad* the property ; that is next of kin.

In *Lownds* v. *Seaton*, (4 *Vesey*, 649,) the clause was— " The remainder and residue of my estate, &c., I give next " kin or heir at law whom I appoint my executor." The question arose between the heir at law of real estate and the next of kin. The Lord Chancellor said, " you have a " fair retort upon each other ; on one side it is contended " that next of kin means heir at law ; on the other side, " that heir at law means next of kin. It must be distri- " buted according to the statute."

In *Vaux* v. *Henderson*, (1 *Jac. & Walk*. 388,) the will was, " I give and bequeath unto Mr. Edward Vaux, £200, " and failing him by decease before me to his heirs." Edward Vaux died before the testator. It was held by Sir

William Grant that the legacy belonged to the next of kin of *Vaux*, living at the death of the testator.

1839.

Wright and others
*v.*
Trustees of Meth. Epis. Church.

In *Guire* v. *Mudock*, (14 *Vesey*, 488,) the devisor gave to one for life all her real and personal estate, but not to commit waste on the lands, and her nighest heir at law, to enjoy the same after her death. The court rejected the construction that the heir at law was to take what was real, and the next of kin what was personal estate. That as both were to be enjoyed together, it was essential for the court to say who should enjoy both; and the court had no alternative but to adhere to the words of the will, and permit the person who answered the description of heir at law to take the whole. The Master of the Rolls also said, " that there was no doubt the heir at law, techni- " cally speaking, could take personal property bequeathed " to him by that description. It was always a question of " intention what the testator means ·by the use of such de- " scription."

Considering the various clauses of this will, I conclude, that the children do not take in the technical character of *heirs at law*, in which case their father would be exclu- ded; and that the term is not a special designation of them to take as children.

Then those who are *next of kin*, are to have the benefit of this legacy. According to my view of the law this leads to the same result as if they took technically as *heirs*. The children are entitled absolutely, and the father excluded.

It is to be observed that the husband cannot take *jure mariti*, for the legacy never vested in the wife, and was not transmissible through her. The question then is, whether in legal strictness a husband is included in the term next of kin. I apprehend that this is fully settled in the negative. (*Garrick* v. *Lord Camden*, 14 *Vesey*, 381. *Watt* v. *Watt*, 3 *Vesey*, 244. *Nichols* v. *Savage*, cited 18 *Vesey*, 52. *Bailey* v. *Wright*, 18 *Vesey*, 49. 1 *Swanston*, 39.) Upon the legal construction to be given to the phrase next of kin, where used *simpliciter*, I may refer to the case of *Elmsley* v. *Young*, (2 *Mylne & Keene*, 82,

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

*and on Appeal*, 781.) The Master of the Rolls had held that when so used, the phrase means those entitled under the statute of distributions. This decision was reversed; but the reversal leaves the position I have assumed wholly unquestioned. Indeed it tends to support it, because the argument, especially of Lord Commissioner Bosanquet, is, that before the statute the words had a clear meaning, applying, according to the language of Lord Coke, to the next in blood.

My opinion, therefore, is, that the children will take this legacy in exclusion of the father.

3d. The next head of examination is as to the bequests to the institutions which are incorporated and designated in the will by their corporate style, or with unimportant variations.

It is admitted by counsel, that the variations in the designation are immaterial as to the Society for the Reformation of Juvenile Delinquents in the City of New-York, The Marine Society of the City of New-York, The Society for the Promotion of the Gospel among Seamen in the Port of New-York, and The New-York Society for Promoting the Abolition of Slavery. The leading cases he has cited in order to overthrow the bequests to the other societies on the ground of misnomer, establish that these are sufficiently described.

With respect to the pecuniary legacies given to these and the other institutions, paid by the executors, charged in their final account, and passed upon by the surrogate, I hold that the point cannot be now raised; neither in the present suit from the omission to present it in the pleadings, nor in any original suit whatever, by the present parties.

The decree of the surrogate is absolute and final. The remedy was an appeal to the chancellor. It has become pleadable in every court as the final sentence and judgment of a competent tribunal upon every matter which it professes to decide, and which is within the jurisdiction of that forum. To suppose that the 65th section of the statute (2 *R. S.* p. 94,) is confined to the mere fact that the

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

payments have been made—dispensing only with the preservation of vouchers, seems to me inconsistent with the object of the statute, and destructive of its utility. The clause in question is, " that the final settlement of the " executor's accounts made in the mode prescribed, shall " be conclusive evidence of the following facts, and no " others. 1st. That the charges made in such account for " monies paid to creditors, legatees, next of kin, and for " necessary expenses, *are correct.*" This phrase cannot mean less than this—that the validity of a debt, and the right of a legatee, is as much pronounced correct, as the fact of his reception of the money.

Although the 66th section of the act provides that the 65th section shall not extend to any case, where an executor is liable to account to a court of equity, by reason of any trust expressly created by any last will or testament, yet I consider that the section can apply only to the few permitted cases of express trusts, of which the present is not one. Neither am I called upon to express an opinion, whether the sentence is final in the case of infants for whom no guardian has been appointed, or those under disability bound only by publication. (See *Kallett* v. *Rathbone,* 4 *Paige,* 106.) The parties now before me it is admitted personally attended, or were personally cited.

A question has however occurred to me, as to the jurisdiction of the surrogate to make any order respecting the payment and distribution of the proceeds of the real estate. Upon examining the 57th section of the title of the powers and duties of executors, &c., (2 *R. S.* 109,) I am of opinion, that whatever he is legally authorized to do as to personal estate, he can do as to the proceeds of realty. The provision is a re-enactment of a law of 1822. Although in terms it refers to an adverse citation of the executors, yet I think an application by themselves is within its spirit and intent. My only doubt arises from the fact that in 1837, the legislature passed an act providing that the proceeds of real estate sold under an authority in a will might be brought into the surrogate's office for distribution, and be distributed in the same manner as

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

if the sale had been made by his order. (*Laws* 1837, p. 537, § 75.) The decree or sentence in this case was in 1834; and upon the whole I consider that the construction of the law as it then existed, conferred upon him power over this fund.

It may be observed that as to the legacy of the executor Macy, a witness to the will, it was paid before any part of the real estate was sold; necessarily out of personal estate.

But upon no principle ought the omission of parties to take an objection to those payments before the surrogate prejudice their right to contest the claim to the surplus here, even if the grounds of the claim were identical, which is not the case.

It may be urged with some plausibility, that the whole of the surplus fund should be treated as resulting from real estate. The personal estate fell short of the amount of the pecuniary legacies to individuals by about $12,000. In point of law, ordinarily the personal estate must be first applied, though the direction to blend the funds here may avoid the application of that rule. In point of fact, by an examination of the accounts it appears, that nearly $24,000 were received upon the sales of real estate by the end of 1832. The legacies were paid out of the mingled fund; but a strict statement would probably show that those to individuals were mainly paid out of the sales of real estate. On the other side, it may be said that in favor of charities, the court will consider the pecuniary legacies as paid out of the avails of the real estate, and the balance only, which would be about $8,000, out of the personalty; thus leaving the surplus fund purely the avails of personal property. Although this was done by Lord Hardwicke in a case referred to by counsel, the rule of the court is now otherwise. (*Hobson* v. *Blackburn*, 1 *Keen's Rep.* 273, and *Williams* v. *Restrom* there cited. *Markham* v. *Hooper*, 4 *Br. C. R.* 153.) I consider the rule to be that if in this case the bequest as to the real estate is void, the surplus must be distributed, by ascertaining what part of it should be considered as coming from real estate, in the proportion of the amount actually derived from real

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

estate, of the aggregate fund resulting from both estates. (See the above authorities.)

It will be, however, more simple to consider the case upon the assumption that the whole fund has arisen from real estate. No counsel has attempted to question that common place of the law, that a plain gift of money or personal property, to a corporation, or to a designated trustee for its use, is unassailable. The ground here taken is, that this land of which the testator died seised, could not, by any provision of his will, be sold, so that the proceeds could be lawfully paid to a corporation which could not lawfully take the land itself.

The devise of the surplus is unquestionably direct to the societies. The language is, "should there be any surplus "of my estate, after paying all my monied legacies, I give "the same to the above named institutions, to be paid to "them proportionally." I cannot accede to the proposition of one of the counsel, that this is to be construed in the same manner as the gifts of the legacies, namely, to the officers respectively, for the use and benefit of the societies. I cannot supply those important words.

To the point now before me, Chancellor Walworth alludes in the case of *The Theological Seminary* v. *Childs*, (4 *Paige*, 423.) He says, "I am not prepared to say that "the devise of a power in trust to sell lands, for the pay- "ment of a legacy charged thereon in favor of a corporation, "would be invalid, even under the Revised Statutes. On "that subject, however, I do not wish to be understood as "expressing any definite opinion."

In the case of *Lorillard* v. *Coster*, (5 *Paige*, 174. 14 *Wendell*, 266,) there was a devise to executors of real and personal estate in trust, as to the real estate in New-York, to lease the same from time to time, and to receive the rents, and out of the rents and profits, to pay a legacy of $20,000 to the Theological Seminary of the Episcopal Church, and $1,000 to the trustees or vestry of St. Philips Church, &c. The Chancellor, (p. 213,) says, that the validity of the trust, as to these legacies, was not disputed, but on the contrary, conceded by all to be valid. It was

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

not necessary, therefore, that he should express any opinion on that question. In the decree in the court of errors, these bequests are stated as not being the subject of appeal to this court. In the opinion of senators Mason and Young, these legacies are expressly stated to be valid, and although all the trusts failed, yet they were charges on the real estate, in the hands of the heir. Chief Justice Savage says, that these legacies were good, as clearly authorized by the second sub-division of the 55th section.

Of course, these positions can only be looked upon as *dicta* of learned men.

In the present case, there is no direct devise of land, and no trust of land in terms created. There is a power and direction given to the executors to sell, and nothing more. It is under the statute a general power in trust. ( § 77 and 94.)

Then the counsel for the societies insist that the case is plainly within the doctrine of equitable conversion. That the land, as land, is not devised to the corporations, nor to any one person as trustee for them; nor is any legal estate in land, by any construction vested in them, but by force of the principle of conversion, the land was money from the death of the testator; and that if a gift of money is to be sustained, this bequest is unimpeachable.

The practical results of the doctrine of equitable conversion, as applied to the change of real into personal estate, are chiefly these. *First*, the rents of the estate between the death of the testator and the actual sale, go to the party who takes the proceeds; *next*, a right in the proceeds, which cannot take effect or vest in the party to whom it is given, passes, where the conversion is established, to the personal representative of the devisor, not to his heir; *thirdly*, where the right has actually vested, but no sale has been made, the personal representative of the party entitled takes, and not his heir; and another consequence also sometimes takes place, that although the heir takes a share which has fallen in, he takes it as money, so that the succession from him is changed. (*Smith* v. *Claxton*, 4 *Mad. Rep.* 491.)

Very little difficulty attends the first proposition, because it is obvious, that if the *corpus* vests in a competent party, the income should naturally follow it, where there is nothing to prescribe a different direction. (*Fitzgerald* v. *Jervoise*, 5 *Mad. Rep.* 22.) And whether there is a devise of the legal estate to trustees or only a naked power, does not appear to make a difference. ( *Yates* v. *Compton*, 2 *P. Wms.* 308.) But as to the next proposition the application of the doctrine, is not so easy. The *criteria* which the authorities upon the subject of conversion furnish, are these—whether the will has prescribed a sale absolutely, and at all events—for all purposes, not merely for the purposes of the will—irrespective of all contingencies, and independent of all discretion. If the sale is to be made for a special purpose, or the general purposes of the will, and these purposes fail, conversion does not take effect; if it is to be made on a given event, it depends upon the occurrence of that event; if the disposition is left to the discretion of the grantee of the power, the will is not imperative, and does not convert the estate.

These principles are to be drawn from the following authorities. *Wheldale* v. *Partridge*, 5 *Vesey*, 388. 8 *Vesey*, 227. Mr. Cox's note to *Cruse* v. *Bailey*, 3 *P. Wms.* 22. *Digby* v. *Legard*, there cited. *Fletcher* v. *Ashburn*, 1 *Br. C. R.* 497. *Ackroyd* v. *Smithson, Ibid.* 509, and Lord Eldon's celebrated argument in that case. *Powell on Devises*, by *Jarmyn*, vol. ii. p. 60. *Leigh & Dalzell on Eq. Conversion*, p. 50, *et passim. McLelland* v. *Shaw*, 2 *Sch. & Lefroy*, 538. In *Solley* v. *Seymour*, *Exch. Dec.* 1837. *Burgess Rep. Law Journal*, vol. vii. p. 12, Baron Alderson said : " The principle upon which the " court proceeds, is clear. We are to examine the whole " will, and see whether the explained intention of the tes- " tator to be collected therefrom was, that the property " should be converted out and out, as it is called; or " whether it was given to the trustee upon trust, either to " sell or not to sell, as he in his discretion might judge " best." He then shows, that in the case before the court, there was a plain indication of a discretion as to a sale, and the property remained as at the testator's death.

1839.

Wright and others
v.
Trustees of Meth. Epis. Church.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

In the case before me, it is certain that the testator meant to have his whole property of every description converted into money, and as such distributed. His language applies to a division of money. But it is equally certain that the sale was to be made for the purposes of the will. It is not clear that he meant his real estate should be disposed of, if the purposes of the will should fail.

Supposing every bequest in this will valid—that the residuary legatees were all competent, natural persons—and that one of them had died before the death of the testator, and after the date of the will, it is clear that the heir of the testator would have had the benefit of the lapse, not the personal representative.

Again, it is equally clear in the case supposed, that although a sale would have to take place, to answer the purposes of the will which could be effected, that would not vary the right of the heir, but he would take the proportion of the proceeds representing the interest which had failed.

It is needless to advert to any other authority than that of *Ackroyd* v. *Smithson,* (1 *Br. C. R.* 502.) Lord Eldon's celebrated argument in that case, has been the settled test of every decision since. The circumstances were very analagous to the present case. The will gave pecuniary legacies to a number of persons, and after devising the real estate in trust to sell, then gave the overplus in the hands of trustees, to the same legatees, *in proportion to the several legacies therein bequeathed to them.* The will also directed the conversion of real and personal estate into money, and constituted the proceeds of both a blended fund for payment of the charges, legacies, and surplus. So far, it closely resembled the present devise; and it was stronger against the heir, because there was an express devise to the trustees, sufficient to carry the legal estate from the heirs ; while here there is but a power.

Two of the legatees died before the death of the testator, and Mr. Scott changed the opinion of Lord Thurlow, and obtained a decree that the heir at law took the shares which fell in of the proceeds of real estate. See also *Hill* v. *Cook,* 1 *Vea. & B.* 173.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

Again, if there had been a portion of the blended fund set apart, and the interest or income of it given to a legatee for life only, with no disposition over, the share which resulted from the real estate, would, on the death of the tenant of life, have gone to the heir of the testator, not to a general residuary legatee, or the personal representative. And so, if one of the legatees was to receive his proportion, on attaining a certain age, and died after the death of the testator, but before the period fixed, the share as far as derived from real estate, would have fallen to the testator's heir. (*Cruse* v. *Barley*, 3 *P. Wms.* 20. But see *Powell on Devises*, by *Jarmyn*, vol. ii. p. 98.)

I consider that the rule as stated by Mr. Cox, (3 *P. Wms.* 22,) will be found strictly sanctioned by the authorities. " The several cases upon this subject seem to depend upon " this question, whether the testator meant to give to the pro- " duce of real estate, the quality of personalty *to all intents*, " or only so far as respected the particular purposes of the " will; for unless the testator has sufficiently declared his " intention, not only that the realty should be converted " into personalty, for the purposes of the will, but further, " that the produce of the real estate shall be taken as per- " sonalty, whether such purposes take effect or not, so " much of the real estate or the produce thereof, as is not " effectually disposed of by the will, at the time of the " testator's death, (whether from the silence or the ineffi- " cacy of the will itself, or from subsequent lapse,) will re- " sult to the heir." See especially *Amphlett* v. *Parke*, (2 *Russell & Mylne*, 221,) in which Lord Brougham overruled the decision of the Master of the Rolls, (1 *Simons*, 275,) and held the heir entitled, in a very strong case. He says, that the rule is exceedingly well stated in a very learned and useful note in the report of *Cruse* v. *Barley*; that Mr. Cox in that note, extracts the sound principle to be collected from all the cases.

As to the question of the devolution of any legally vested share, by the death of the party before a sale, it would

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

have been personal property, and gone as such. (*Grieveson* v. *Kirsopp*, 2 *Keen*, 654. *Smith* v. *Claxton*, 4 *Mad.* 491.)

It is therefore unquestionable, that. there was no such conversion made in this will, as would have changed the course of transmission of the property, in case of the death of a legatee, in the life of the testator. There was no conversion out and out.

But it may be urged, that even if it must be granted that there was no conversion wrought by the devise for every purpose, yet for the purpose of supporting those charitable bequests, it shall be treated as made. This argument supposes *pro hac vice*, the illegality of the bequests at law; for if they are legal, there is no need of invoking the aid of this doctrine. But it then involves the inconsistency of sustaining in equity what is condemned at law.

The question is not whether a court of equity does not extend relief in many cases where courts of law give no relief, and does not hold peculiar doctrines for the purpose; but whether it will support that which the law *condemns*; and especially in this case, if it will apply the doctrine alluded to for such a purpose.

Here the very point in controversy is, whether a devise authorizing land to be sold, and its proceeds paid to these institutions, is a valid devise. Is inquiry into this validity to be arrested by the fiction that at the time of the testator's death it was money? I apprehend there is no law for the proposition.

Nothing is more clear as a general proposition, than that where a legacy payable out of the sale of real estate fails, because void at law, it goes to the heir. (*Gibbs* v. *Ramsey*, 2 *Ves. & Bea.* 294. *Cooke* v. *The Stationers' Company*, 3 *Mylne & Keene*, 262. *Hawley* v. *James*, 3 *Paige*, 219. *Jones* v. *Mitchell*, 1 *Sim. & St.* 290.) It is true that in some of the cases, the disposition of the proceeds itself was expressly void. Most of the English cases, however, are where the gift has been void, because within

1839.

Wright and others
v.
Trustees of Meth. Epis. Church.

the statute of mortmain 9 Geo. II. c. 36. By the settled construction of that act, as I shall hereafter show, money arising from the sale of land given to charitable uses by a will, is a void bequest. But it is not avoided by the letter or terms of the statute, and a direct gift of money is perfectly valid. Here then was the fairest case imaginable for the application of the rule insisted upon. If the court could hold that the land should be deemed money at the very death of the testator, it would save the gift ; but such a construction has never been attempted.

It is true that in the case of *Gott* v. *Cook*, (7 *Paige*, 534,) the chancellor says, " that as this court considers a " direction to convert one species of property into another, " for purposes which are valid at law, as tantamount to an " actual conversion thereof, the whole trust fund must be " considered as personal estate for the purpose of ascertain- " ing whether the several bequests of future or contingent " interests therein are valid." In that case the proceeds of the real and personal estate were to form one fund, and the income was given in valid bequests. The rule was applied to test future and uncertain limitations.

So in *Hourmelin* v. *Sheldon*, (1 *Beavan's Rep.* 79,) cited by the chancellor, there was an express valid estate in trustees with a direction to sell. There was no immediate right vested in the aliens, as to whose shares the question arose ; but all the vested right was in English subjects, and the interests of the aliens were dependent on the determination of those vested interests.

It is to be noticed that in the previous case of *Fourdrin* v. *Gowdey*, (3 *Mylne & Keene*, 383.) Sir John Leach had made a decision contrary to that in *Hourmelin* v. *Sheldon*. Lord Langdale in the latter case distinguishes it in several particulars ; among others, that there was no devise to trustees, but a power only ; and the heir at law being an alien, the crown would take the proceeds after paying the proportion of debt, &c. After all however, he disclaims the authority of the case ; but, what is of moment to remark, he does so upon the ground of an improper confounding of the policy of the law as to mortmain, with

CASES IN CHANCERY.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

that as to alienage. In this view the case of *Fourdrin* v. *Gowdey* is confirmatory of the view I have now taken. I would also refer to the most able decision of Sir Christopher Pepys, in *Cogan* v. *Stephens*, 1836, reported in *Lewin on Trusts*, Appendix, No. 2 ; a case followed in *Hereford* v. *Ravenhill*, 1 *Beavan's Rep.* 481.

My conclusion is, that I have no right in considering the question of legality, to treat the gift as one of money at the death of the testator.

There are two branches of this point of legality—*first*, as to the bequest of the surplus to arise from the sale : *next*, as to the right to take the rents down to the time of the actual sale. But it is plain that the latter right is separable and distinct from a right to take the avails of a sale. The one might be illegal and the other valid. Hence we must ascertain whether both are void, or either can be supported. If the gift of the surplus fails, the right of the corporations to the *interim* rents must fail ; although it does not follow, that because the gift of the surplus is valid, the right to such rents is perfect. And if the bequest of the surplus is void, then the sale was to fulfil a void devise, and the property as between the heir and the personal representative is to be taken as unchanged. The question we perceive hinges on the validity of the gift.

I. It is insisted that this bequest is void under the statute of wills and testaments. The first section of that act provides, that all persons, except, &c., may devise their real estate by a last will and testament executed as directed. The next section is, that every estate and interest in real property descendible to heirs may be so devised ; and then follows the section that such devise may be made to every person capable by law of holding real estate ; *but no devise* to a corporation shall be valid unless expressly authorized by its charter, or statute to take by devise. Now it seems to me clear, that the phrase *no devise* in this last clause includes a devise of any estate and interest in real property descendible to heirs, as well as real estate itself. The first section gives the power ; the next, ex-

presses, that descendible interests shall be devisable. The phrase *such devise* at the commencement of the third section, plainly covers a devise of every descendible estate and interest in land. And the term *no devise* must, it strikes me, upon all sound construction, include the same. It follows that a devise to a corporation of any estate *or interest* in land which is descendible is void.

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

Now I apprehend that although the statute has made every descendible interest devisable, yet it has not restricted the power to devise to such interests as are descendible. The provision was intended to terminate a question then in litigation in our highest courts as to the devisability of a right of entry, and the general question whether all descendible interests might not be devised. (*Jackson* v. *Varick*, 7 *Cowen*, 238. 2 *Wendell*, 166. *Reviser's Notes*, vol. iii. *R. S.* 627.) There were, however, several interests in lands which were not descendible, and yet before the statute were devisable. A lease for *years* will pass to a devisee under a general devise of *lands* and *tenements*, where there is no lands in fee simple upon which the devise can operate. (*Rose* v. *Bartlett*, *Cro. Car.* 293, which is admitted to be law to this day. *Powell on Devises*, by *Jarmyn*, 127. 140.) But a lease for years was always assets to go to the administrator, and is so declared by the Revised Statutes. (2 *R. S.* 82, § 6.)

Again, before the statute 29 Car. II. cap. 3; an estate held for the life of another person went to the heir. By that statute it was made assets for debts in the hands of the executors, &c. And by the 14th of Geo. II. c. 20, the surplus was to go in course of distribution. (See *Toller's Executors*, p. 140.) By our present statute also, such an interest is assets in the hands of the administrator. (2 *R. S.* 82, § 6.) But unquestionably before the Revised Statutes such an interest was devisable, and passed under a general devise of lands and tenements. (*Powell on Devises*, 138.)

We are to notice that in these instances estates or interests in lands which could not go to the heir might be devised, not specifically, which would be a bequest of per-

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

sonal property, but under the term *lands, real estate, real property*. In other words the lease for years, or the estate for the life of another was in construction of law, lands or tenements, or partook of that character.

It would be a strange construction of a provision avowedly intended to enlarge the capacity of devising, to make it abridge and impair that capacity. Rejecting then this interpretation, the result is, that either under the general term of *real estate*, or the phrase *every estate and interest in real property*, every interest which before that statute was devisable, remains so ; and every interest which was before descendible, becomes so.

It was once made a question upon the statute of wills, whether a power to sell lands could be devised. It was settled in the affirmative. ( *Townsend* v. *Whalley*, Croke *Elizabeth*, 341.) Now such a power, unless expressly so limited, would not go to heirs.

Hence, upon the construction I have dwelt upon, a devise to a corporation of a power to sell land, though for the use of others, would be void. (See *Sowley* v. *The Clock Maker's Company*, 1 *Br. C. C.* 81.) But then the question reverts, whether, when there is no devise at all direct to the corporation, but a right to take the proceeds of the sale of the land under a power given to another, it is void.

Now upon the mere words of the statute it is plain, that only a direct devise to a corporation is prohibited. Apart from the intention of the legislature in the passage of this act, and other contemporaneous statutory provisions, the question on the phraseology alone would still be open, whether a devise of land to a trustee for the use of a corporation was not good, and to be sustained in equity.

But the great objection raised to the bequest under this statute, is upon the ground of its being an immediate gift ; and I apprehend it rests upon the following positions. That every devise to a corporation, whether of an estate in fee or any other estate, or any interest in land, is by this act absolutely prohibited, and rendered void. That in this particular the statute was intended to be a prohibi-

tion, in contra-distinction to the exception in the old statute of wills.  That the act is equivalent to that of 9 Geo. II. c. 36, the statute of mortmain.  That a corporation entitled to take the proceeds of land devised to be sold, or which is directed to be sold by executors, and entitled to compel the execution of that power of sale, has an interest in land.  And that the settled construction of a similar phrase in the English statute decides, that this right is such an interest in land, and is void.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

Upon the first of this series of propositions, viz. the force of the present statute as a prohibition, and the meaning of the phrase, it will be necessary to examine the construction given to the former statute of wills.

In *McCartee* v. *The Orphan Asylum*, (9 *Cowen*, 438,) Chancellor Jones held, that there was a trust for the benefit of the corporation.  That there was no immediate devise of land, or of any rent or profit out of land to the corporation.  That they were *cestuis que trust* merely. He then says, (page 444,) " But the validity of the trust " for the complainants is strenuously contested.  The ob " jection to it is, that being a trust of lands to a corpora " tion, it was in effect a devise of the land to the corporate " body; and it was broadly contended that the devise of " land to trustees for the benefit of a corporate body is " void, and the principle was pushed to the extent of in " sisting, that a devise of the proceeds of land directed by " the will to be sold is equally within the prohibition of " the act.  The position is, that the corporation, notwith " standing the form of the devise, are to be. regarded as " standing on the same ground as if they were the imme " diate devisees of the land.  To this position I am not " prepared to assent."

The chancellor then proceeded to establish his view of the case; and he declares and seeks to prove these points.

*First*, that there was no devise directly to the corporation, but to trustees for its use.

*Secondly*, that such a devise was valid, because the decisions under the English mortmain act, (9 Geo. II. c. 36,) did not bear upon the case.  That statute avoided all

gifts, &c., in trust, or for the benefit of any charitable use, as well as all direct gifts, unless made as directed by the act. He admits, that if that statute, or any correspondent provision, was in force here, the devise might perhaps be indefensible. Next, because that prior to that statute, devises to corporations or for charitable use, and not within the statutes of mortmain, were lawful; that the use or trust of land, was entirely distinct from the land itself, and collateral to it; and that there was no prohibition restraining corporations from taking the beneficial interest in land as *cestuis que trust*. The chancellor then argued, that there was not an executed use under the statute of uses, but a subsisting trust; and contended, that supposing it was executed, the devise could still be supported, for the corporation would not take by the devise, but by operation of law by a statute conveyance. This portion of his reasoning has not received approval. Again he holds, that if the devise was void at law, as in effect a devise of land for the corporation, still it would be supported in equity; and lastly, that the asylum was under the word *purchase* used in its act of incorporation, entitled to take by devise.

In the court of errors, the leading opinion was delivered by Justice Woodworth, and the ground of that opinion is, that the devise was in fact direct to the corporation, and therefore void under the statute of wills: and that the term *purchase*, in the act of incorporation, must be construed in its popular acceptation, which did not include a devise. Again he says,—" upon the supposition that the " child had lived to twenty-one, or married, I admit that the " legal estate would have remained in the executors, until "they had performed the trust before specified, and had " they refused to pay one half of the proceeds of the sale, " the respondents would be entitled to relief." It is to be observed, that in the events above noticed, the trust was to sell the real estate. This opinion was concurred in by ten senators out of the seventeen who voted, and by Justice Sutherland.

It is then settled by this decision, that a devise directly to a corporation, for charitable purposes, could not be sup-

1839.

Wright and others
*v.*
Trustees of Meth. Epis. Church.

ported; but that a devise in trust was valid, and could be enforced in equity; and distinctly, that a devise to sell lands and pay the proceeds, was valid. But in the dissenting opinion of Senator Stebbins, after holding that the fee continued in the trustees, for the use of the corporation, he contends, that the devise of a use was not within the exception of the statute; thus asserting the principle which the majority of the court assented to, but considered as not applying to the case. He then observes in substance, that the exception in the statute was not for the purpose of prohibiting corporations to take by devise, but to avoid the consequence which otherwise would have been produced, of repealing the statutes of mortmain. But for the exception, corporations would have been enabled to take. Then he observes,—" the distinction is a wide one, be-" tween an incapacity to devise, and a prohibition against " taking; for although there may be an incapacity to de-" vise directly to a corporation, yet such incapacity will not " prevent the corporation from taking by grant from the de-" visor in trust, if there is no prohibition against their taking. " So too there may be an incapacity to devise lands to a " corporation, and yet the corporation may take a use, but " in either case, if prohibited from taking, the law would " not probably allow that to be indirectly done, which " was directly prohibited."

This cause was finally decided in December, 1827. While it was proceeding in our courts, the revisers had prepared a part of the statutes, including the statute of wills, and this passed the legislature, at their special session in September, 1827. In the note which they submitted, they say, in reference to the 3d section of the statute as it now stands,—" It has been put in the form of a " positive prohibition, with the view of calling the atten-" tion of the legislature to it; that it may be retained, if it " is intended to be prohibitory, or it may be expunged if " it is deemed unnecessary. It is a question now agitated " in our courts, whether it is to be considered as prohibitory " or not."

It is to be assumed, that the revisers intended to carry

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

the legal consequences of their alteration, far beyond the operation of the old statute ; and it is most probable, that they had in view the abolition of a trust for a corporation, as well as a direct devise.   At least, I do not perceive any other legal consequence, which could have been contemplated.   But it is extraordinary that they should not have used language so explicit as to preclude uncertainty in this matter.

However, considering the circumstances of the passage of the act; that it was before the statute of wills had received that full discussion which was given it in the court of errors, I feel myself at liberty to interpret the third section of the act, by the import of its language, and by the light of other statutory clauses, without regard to the probable views of the revisers.   And if this can be done, I hold it certain that the present act has not the slightest operation or force beyond the former ; that the exception in the old statute, was as effectual a prohibition, as the enactment in the present.

The prohibition, it is accurately said, was made in England by the statutes of mortmain, prior to the statute of wills.   Then the exception prevented the repeal of the prior statutes; and hence the prohibition did not, in fact, arise from that act.   But when the exception is inserted in a statute of our own state, where no statutes of mortmain had ever been passed, (and it is admitted the English acts did not extend to the colonies,) what is the case ? It is a fresh original enactment, to be construed and applied by the legal import of the words.   These words are, " any " person having any estate of inheritance in any lands, " tenements, &c., may give or devise the same to any person " or persons, *except bodies politic and corporate.*"   Chancellor Jones takes, in very clear language, a position wholly indisputable.   " The exception acts upon both the devisor " and devisee ; and equally disables the one from devising, " and the other from taking under the devise."   Now if a corporation cannot take an estate in land, because a devisor cannot give it; if the one cannot acquire, nor the other impart, I should conclude that the gift was void.   And it

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

would be strange reasoning to hold, that a gift made void by a statute, is not prohibited by a statute. Bring then this unavoidable result of the old statute in contact with the provision of the new, and what is the consequence? The old enactment renders the devise invalid, and the new one declares that no devise to a corporation shall be valid.

1 conclude, therefore, that there is no ground for deciding that the statute of wills, by its unaided force, avoids a devise of land to a competent person in trust for a corporation, nor abolishes any doctrine which entitled corporations to receive the avails of land sold under a trust power.

But here a formidable objection to the support of a great class of such trusts arises. If the trust, as is very common, was to receive the rents and profits, and pay them to the corporation, or apply them to its use, it would not be an express trust, saved by the 3d subdivision of the 55th section of the Statute of Uses and Trusts, for the application can only be made during the life of a person, or for a shorter term. And then the 47th seventh section bears upon such a trust. " Every person entitled to the actual " possession of land, and the receipt of the rents and profits " thereof, in law or equity, shall be deemed to have a legal " estate therein, of the same quality and duration as his " beneficial interest."

So, by the 49th section, " every disposition of land, " whether by deed or devise, shall be made directly to the " person in whom the right to the possession and profits " shall be intended to be vested, and not to any other, to " the use of, or in trust for such person ; and if made to " one or more persons, to the use of or in trust for another, " no estate or interest, legal or equitable, shall vest in the " trustee."

If then these provisions extend to charitable corporations, a devise which gives the land to another, in trust for such a body, must immediately vest the whole legal, as well as equitable estate, in that body. If the corporation is to have the profits, the trust is annulled; all right and title

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

is concentrated in it; and it will be impossible not to hold that the will becomes equivalent to a direct devise. And these clauses are followed by a similar provision, bearing pointedly upon the present will.

Had there been in it a direct gift of the land to the executors in trust to sell and pay the legacies, it would *prima facie* have been saved as an express trust by the 2d subdivision of the 55th section of the act. But the 56th section controls the operation of that subdivision, and prevents a valid trust estate from vesting. It provides " that " a devise of lands to executors, &c., to be sold or mort- " gaged, where they are not also empowered to receive the " rents and profits, shall vest no estate in the trustees; but " the trust shall be valid as a power, and the lands shall " descend to the heirs, or pass to the devisees of the testa- " tor, subject to the execution of the power."

It strikes me with much force, that what is applicable to a trust estate converted by this section into a trust power, must be applicable to a naked trust power when the subject is the same, *viz.*, lands to be sold by executors by virtue of a devise. Under the clause quoted it would be clear, that if there was a pecuniary legacy bequeathed, and a devise of lands to executors to sell and pay it, and no residuary disposition, the land would vest in the heir, and he would take the profits. Again in such a case, if there was a general residuary devisee, or a residuary devisee of the lands directed to be sold, the estate and the interim rents would vest in him.

In this instance the legatees of the whole residue are also to a great extent legatees of particular sums. But I cannot see that there is in this any ground for a distinction. The devisees pointed out in the section must be devisees of a surplus of avails, not devisees of land remaining in *specie ;* for the lands given to be sold are the lands which in the mean time pass to them.

If this is correct, where is the title under this will until a sale ? It passed to the devisees. These can be no other than the corporations. But if so, the corporations took an immediate right to the land; a right to the rents; to the

possession ; a perfect estate for every purpose, enduring until a sale. And if the pecuniary legacies had been small and could have been paid out of personal estate, these institutions alone would have had an interest to cause a sale, and the land might have remained in perpetuity unconverted into money.

1839.

Wright and others
v.
Trustees of Meth. Epis. Church.

My reflections have supplied me with but two answers to this argument ; one of which is purely technical ; but the other appears satisfactory, if not conclusive.

First, that the section shall, in favor of these charitable gifts, be restricted in terms to the case provided for. That to annul such a gift, as Lord Hardwicke says, the bird must be hit in the eye. Now it provides in terms for the case of a devise of lands to the executors themselves, to sell or mortgage. It does not in terms apply the same provision to the case of a naked power to sell.

But another answer is more forcible. It will be noticed that the land is to pass to the devisees subject to the execution of the power. Hence the estate which vests in them lasts only while the power is unexercised. That estate or interest, thus passing to a corporation, is void ; but a distinct right to the avails resulting from the execution of the power is not necessarily void. If the latter right is not in itself avoided, then all that *is* annulled is the intermediate estate ; which is a right to the rents and profits until a sale. And as these profits must by this construction go to others, it is rendered the plain interest of the corporation to urge the disposition of the land, and thus to avoid perpetuity. These rights and interests are in their nature separable and distinct. The propositions I deduce are these : By virtue of the 56th section of the statute of uses and trusts, the land, between the death of the devisor and the execution of the power, vested in the corporations. The statute of wills then operates, and avoids the estate or interest thus vested. But that is all that is avoided. The right to take the proceeds of the land, when sold by the exercise of a power given to another, is a different right.

The next and strong objection urged against the be-

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

quest arises under the statute 9 Geo. II. cap. 36, and the authorities expounding it. By that act, no lands, tenements, hereditaments, corporeal or incorporeal, nor any sums of money, goods, chattels, or other personal estate to be laid out in the purchase of any lands shall be given, aliened, *limited, assigned, or appointed* to or upon any person or persons, bodies politic or corporate, or otherwise, *for any estate or interest whatsoever*, or in any way charged or incumbent by any person whatsoever *in trust* or *for the benefit* of any charitable uses whatever, unless such gift be by deed executed twelve months *previous* to the donor's death in the mode prescribed. All gifts, &c., made in any other way are void.

The language of the statute as bearing upon the point in hand may thus be analyzed. That any gift, limitation, or appointment to any person of any interest or estate whatsoever in lands, for the benefit of any charitable use shall be void. Without minutely going through the act, I take this proposition to be as clearly enunciated in it, as if expressed in the identical words.

The earliest case in this court was I believe that of the *Attorney-General* v. *Weymouth*, (*Ambler*, 20, the 16th of George II.) The testator directed that his debts, legacies, &c., should be paid out of his personal estate ; but if it was insufficient, then the deficiency to be made good by and out of the monies to arise from a sale of his real estate. Among such legacies were certain to charities. An information was filed by the attorney-general to have the lands sold, and the proceeds applied under the will. But the case was held to be within the statute.

Lord Hardwicke observed, that this act was stronger than that of 11 and 12 Wm. III., against Papists, for there the disability was upon the person taking ; and it was said that he could take it as money which was not prohibited, but here the disability is laid upon the person devising. Again, Lord Hardwicke says, "if, instead of devi-" sing the surplus, the testator had said I charge my land " with the payment of £1,000 to a charity, it would have " been void by the express words of the act, and will it

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

"not be extremely absurd to say he shall be able to give "his whole real estate to be turned into money for the "benefit of a charity !"

In the *Attorney-General* v. *Caldwell*, (*Ambler*, 635,) the testator gave the remainder of all his effects, mortgages, &c., to be sold and the proceeds to be given to two charity schools. The mortgages were for years. The Master of the Rolls was clear that the bequest as to the mortgages was void. The mortgages upon which the court had given judgment were in fee, and this was only for years. But that makes no difference ; it is an interest in the land.

In the *Attorney-General* v. *Graves*, (*Ambler*, 155,) the question was upon a devise of the residue of real and personal estate to charitable uses, where part consisted of a term vested in the testator as lessee. It was held within the act. Lord Hardwicke said, the words of the statute " any interest or estate whatsoever," were insisted to mean only, that a person should not devise *his own land* for any estate or interest whatsoever. That there was no color for that construction.

In *Negus* v. *Coulter*, (*Ambler*, 307,) a devise to charitable uses of a lease from the crown for years of the right and power of laying chains in the river Thames for mooring ships, was held within the act as an interest in land.

In *Curtis* v. *Hutton*, (14 *Vesey*, 540,) Sir William Grant says, " the statute of 9 Geo. II. c. 36, contains no express " words prohibiting a bequest of money to be produced by " the sale of lands for charitable purposes ; but it is settled " by construction that such a bequest is within the mean- " ing and spirit of the law ; and it is clear that no charity " in England, not within the exception of the statute, " could have derived any benefit from the produce of the " real estate." The question was upon a disposition by will of lands to be sold, and the produce with the personal estate, to be laid out in lands or the funds for the maintenance of a charity in Scotland. This was held to be within the act.

To these authorities may be added the case of *Hayter*

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

v. *Goode,* before the vice-chancellor in 1832, cited by Mr. Seaton, (*on Decrees,* p. 130.) It is known that his precedents are taken from actual decisions. And the late case of *Mather* v. *Scott,* (2 *Keene,* 172,) illustrates this question. There was a gift of the whole residue of personal estate, with a request that the persons would interest the lord of the manor to grant waste lands for the erection of buildings for a charitable purpose. The gift was held void, because even if he did not direct the purchase of land, it was given as an inducement to draw land into mortmain. See also *Kirkbank* v. *Hudson,* (7 *Price,* 221.)

Lastly, Mr. Powell, in his Treatise on Devises, observes, " On a review of the preceding cases it will be seen, how " anxiously the judicial authorities lent their aid to give " full effect to the legislative enactments of the last statutes " of mortmain by a liberality of construction of the words " ' any estate or interest whatsoever' in lands ; extending " it to money to arise from real estate directed to be con- " verted, &c."

It is not to be denied that the argument deduced from these authorities possesses great force. Yet we find in the English act language far more comprehensive and decisive than in our own. No lands can be in any way *limited* or *appointed* for any estate or interest in *trust or for the benefit of any charitable use.* Now a power over lands to sell them is a limitation or appointment of lands, and the direction to pay the proceeds to a charity is creating such a limitation for its benefit. There can be no escape from this construction. But our own statute falls much short of this. The devise of an interest in land to a corporation is annulled ; the limitation of a power to another to sell, and pay the proceeds over is not annulled. It falls not within the letter, and there is no reason for conjecturing that it was within the meaning of the legislature, when, had it been so, there was the model before them of the statute of Geo. II. so ample in its provisions, and so decisive in its language.

Thus, in my opinion, a devise in trust to sell, and pay the proceeds to a corporation, is valid within the Revised

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

Statutes, although the trust is changed into a power, and although the rents and profits accruing before the sale, cannot go to that body, but vest in others—a devise to lease property, and pay a legacy to a corporation is valid, within the 2d subdivision of the 55th section ; and a naked power to sell and pay over the proceeds, must, in like manner, be valid.

So far I consider the great law of charities has been saved. Whenever the question fairly arises, whether a devise of land to trustees, in trust to pay and apply the rents and profits to the use of a charitable corporation, is valid, many considerations of moment will occur. Our statute of trusts is the latest struggle of the legislature " to marry, and as it were to bind by an indissoluble knot, " the beneficial interest to the land." That struggle began at the cradle of uses in the reign of Richard II.; and from the great statute of Henry VIII., which was supposed to have dug their grave, arose the doctrine of trusts : *aliusque et idem nascitur*. But by the very statute of Richard II. uses were declared to be a subtile imagination, and within the statute of mortmain. And yet it is clear, that religious and charitable uses, as distinguished from superstitious uses, (which statutes growing out of the reformation denounced,) were then upheld. It is certain that the statute of 43 Elizabeth, so much canvassed, presupposes the very legality of gifts, which it only in a new mode regulates. It is certain, that bequests to charity, not within the enumeration of the statute of Elizabeth, have been since, though rarely sustained; and we may view all these statutory provisions of 1830, as merely a great statute of uses. Many considerations of this nature will crowd upon the mind of the judge who shall have to decide that question.

4th. The next topic of consideration, was the case of the corporation claiming a share of the surplus, but whose description in the will, it is said, is wholly defective and uncertain, so that the corporation claiming, cannot take. This applies to the Trustees of the Methodist Episcopal Church.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

The bequest is " to the Methodist Society that meets in
" the Meeting-house in John street." The corporate style
of the defendants claiming is, " the Trustees for the Cor-
" poration of the Methodist Episcopal Church in the city
" of New-York."

It is stated by Mr. Keese, a witness, that there is no
separate religious society, known as " the Methodist Society
" that meet in the Meeting-house in John-street." It is
also in evidence, that there were at the date of the will,
eleven churches, forming a common society; and the
Methodist Society in John-street, composed a part of the
said church. The churches all belonged to the same cor-
poration; were all managed by one Board of Trustees;
and there were no distinct societies.

The difficulty is, that the present claimants do not ap-
pear to have been the body intended as the object of the
testator's bounty. There is no corporation apparently
meant, but misnamed. (*Kyd on Corporations*, 236.) It
is going too far to say that the whole incorporate body of
the Methodist Church was alluded to by a gift to this de-
tached branch of it. Thus the question upon the autho-
rities, as to the slight or material misnomer of a corporation,
does not arise. The view I take of this part of the case,
is this: The society in John-street exists as a portion of
the whole Methodist Episcopal Church in the city of New-
York. It has, of course, some separate organization—a
separate minister—some separate officers, although governed
by the general Board of Trustees. That board may be
treated as the agent of this distinct portion of the church.
Payment of any gift for its use could be lawfully made to
that board as its general agent, if the gift is valid. If,
however, there is a separate treasurer, clerk, or secretary,
the decree may direct payment to him.

But if I am wrong, and the general society can take
under this bequest, it is in any point of view valid; for
if it were clearly real estate devised, the act of 1784,
under which they were incorporated, enables them to hold.
It is to be construed, in my opinion, as authorizing subse-
quent acquisitions by devise, not sanctioning previous ones.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

5th. As to the bequests to the Friends' Monthly Meeting, and the Friends' Yearly Meeting. In the body of the will, $5,000 was given to Thomas Everit, Treasurer of the New-York Yearly Meeting of Friends, in trust for the use of such meeting. By the codicil, this gift is annulled, and there is substituted a bequest of $5,000 to Thomas Everit, Treasurer of the Monthly Meeting of New-York, for the use of such meeting. But the gift of a proportion of the residue to the Yearly Meeting remains unchanged by the codicil.

There seems to me no ground for hesitation, in holding that the bequest of $5,000 goes to the Monthly Meeting, and the share of the residue to the Yearly Meeting. The provisions are explicit and consistent in themselves, whatever doubt counsel may surmise as to the testator's intentions from extraneous circumstances.

Then as to the validity of the gift of the residue to the Friends' Yearly Meeting—the general result to which I have arrived in the previous part of this case is, that the bequest of the surplus to the corporations was not a devise of land, or such an interest in land, as to fall within the statute of wills, and that the estate which the statute of uses vested in the corporations, assuming it to be void, was distinct from the bequest of the surplus proceeds, which might still take effect. But in the instance of a proper incorporation, there is a party legally competent to take, competent to sue, known and defined in the law. A voluntary association has not that capacity.

This presents in almost the identical form, the point which was determined in *The Baptist Association* v. *Hart's Executors*, (4 *Wheaton*, 1.) The language of the bequest here, is substantially,—" I give the surplus of my " estate, to the above named institutions, one of them be- " ing the Yearly Meeting of Friends," a voluntary unincorporate society. In the Baptist Church case, the bequest was, " what shall remain of my military certificates, " both principal and interest, I give to the Baptist Asso- " ciation, that for ordinary, meets at Philadelphia annu- " ally."

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

This important case has often been referred to as relating to land, under the supposition probably, that the military certificates were similar to land warrants. But it will be noticed, that the bequest was of what should be due for principal and interest upon them, and the bill was against the executor. I have taken pains to ascertain their true character, and by the kindness of Mr. Benjamin F. Butler, have been furnished with a very satisfactory explanation.

By an act of the General Assembly of Virginia, of May, 1779, half pay was to be allowed to officers of the continental army. Certificates to this effect were issued, and finally provided for by act of Congress of July, 1832. (*Laws First Session,* 22*d Congress,* p. 150.) Mr. Butler also informs me, that as Attorney-General he had given an official opinion, that the claim under the act of Congress belonged to the executor, not to the heir.

It is then manifest, that the gift in the case of the Baptist Association, was of personal estate, and the doctrine of the supreme court was, that such a gift to such an association was void, and upon the ground that charitable bequests, where no legal interest is vested, and which are too vague, and the object too indefinite to be claimed by those for whom the beneficial interest was intended, cannot be established in a court of equity. The bequest here is to a body equally vague and uncertain, composed, in the language of the witness, " of the members of the Religious " Society of Friends residing in Vermont, New-York, part " of Massachusetts, Connecticut, and Upper Canada," as uncertain a class of persons to take as can be imagined.

This question is very slightly affected by authority, in our State. The case in 7 *Johnson's Ch. Rep.* (*Coggshall* v. *Pelton,*) received little consideration, and the uncertainty was removed by an act of the legislature. Yet many expressions have flowed from judges of our own country, tending to question the decision of the supreme court of the United States; and in some instances its principles, at least, have been disregarded. In other cases it has been strictly pursued.

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

The great subject of controversy has been, whether the jurisdiction of the court of chancery, did not arise from the statute of 43 Elizabeth; whether it could enforce any trust for charities before; and if it could in any case, whether it could when the objects were wholly uncertain, so that the bequest was void at law; whether a direct gift could be sustained, without an intervening trustee.

In the Baptist Church case it was held, that an association not incorporated, could not take as trustees. That individuals composing such association at the death of the testator, or the vesting of the devise, could not take as trustees, because it was the association in perpetuity, not those individuals and their representatives, who were to manage the funds. That there were no persons to whom the legacy could be decreed beneficially, if it were not a charity; and that legacies to charities formed no exception under the general jurisdiction of the court, but were sustained in England under the statute of Elizabeth only, Justice Story, both in his elaborate opinion in this case, and in his Commentaries on Equity, has largely, and with his usual learning, discussed this subject. His conclusion is, " that upon the whole, it appears to be the better opinion, " that the jurisdiction of the court of chancery over chari- " ties, where no trust is interposed, or where there is no " person *in esse* capable of taking, or where the charity " is of an indefinite nature, is not to be referred to the general "jurisdiction of the court, but sprung up after the statute of " Elizabeth, and rests mainly on its provisions." (2 *Comm.* 410.)

In *Gallego's Ex'r.* v. *Attorney-General,* (3 *Leigh's Rep.* 450,) there were competent trustees, a clear unquestionable trust. The testator gave his lot in Richmond, No. 630, to such trustees, upon trust, that they should permit all and every person and persons belonging to the Roman Catholic religion, and residing in the city of Richmond at his death, to build a church on the said land for the use of themselves, and of every other person of that religion who might thereafter reside in Richmond. This was held void. Carr, J., " I ask, who are the benefici-

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

" aries ?  The individuals to-day may not be the same " persons composing the congregation to-morrow.  The " English cases rested on the 43 Elizabeth, and did not " belong to the ordinary jurisdiction of the court.  That " act being repealed in Virginia, charitable bequests stood " on the same footing as other legacies."

Tucker, President, pursues the same course of reasoning more at large, and says the intervention of a trustee does not remove a single difficulty.  There is not more necessity for a properly defined grantee in a deed, than for a *cestui que trust* capable of taking, and so defined that the trust will not be void for uncertainty.  He also supports the positions that the enforcement of indefinite charities depends upon the statute of Elizabeth ; that charitable gifts were known and recognized prior to that act, but only where the beneficiary or grantee was a person, whether natural or artificial, capable to take ; and that it had not been and could not be shown, that indefinite charities were supported before.

And Justice Johnson, in Ingles' case, says, " I consider it " as too plain to be questioned that the powers which the " court of chancery in Great Britain exercises over be " quests of charities, in cases where the interest cannot " vest under the rigid rules of law, as applied to other be " quests, is vested in that court by, or rather usurped under, " the statute of Elizabeth.  I am not now speaking, it must " be noted, of the power of the crown in such cases, but " of the position of the prerogative power over charities " now exercised by the court of chancery in that kingdom."

So, J. Story, in the Baptist Association case, (3 *Peters,* 494,) says, " so that it appears since the statute of Eliza " beth, the court of chancery will not establish any trust " for indefinite purposes of a benevolent nature, not chari " table within the purview of that statute, although there " is an existing trustee in whom it is vested ; but will de " clare the trust void, and distribute the property among " the next kin."  The case of *Janey's Ex.* v. *Latane and others,* (4 *Leigh's Rep.* 327,) is placed upon the same principles as the case of *Gallego's Executors ;* but it is by

1839.

Wright and others
v.
Trustees of
Meth. Epis.
Church.

no means so strong, inasmuch as there was no competent grantee to take in trust. It was a case within the admitted principles of the Baptist Association case.

*Dashiell* v. *The Attorney-General*, (5 *Harris & Johns.* 292,) was a case of trustees perfectly competent to take, and they were to apply the income to the support and education of the poor children of St. Peter's Prot. Epis. Church. Buchanan, J., says: " The peculiar law of cha-" rities originated in the statute of 43 Elizabeth. Inde-" pendent of that statute, a court of chancery cannot sanc-" tion and enforce a bequest to charitable uses, which, if " not a charity, would on general principles be void." He adds, " it is an admitted general principle that a vague " bequest, the object of which is indefinite, cannot be esta-" blished in a court of equity." He takes also the same view of the power of the court before the statute of Eliza-beth as is taken by President Tucker in the case before mentioned in 3 *Leigh's Reports.*

To these decisions may be added that of *Green* v. *Dennis*, (6*th Connect. Rep.* p. 392,) although it was a case at law, and the court, while it held that no action for the land devised could be sustained by the Friends' Yearly Meeting, state explicitly that they do not mean to express any opinion as to the power of chancery to relieve.

On the other side, in *Griffin* v. *Graham*, (1 *Hawkes' N. C. Rep.* 96,) it was held, that where there is a trust and trustee, with some general or specific objects pointed out, or trustees for general and indefinite charity, a court of equity as a matter of trust takes cognizance of it in virtue of its ordinary jurisdiction. The testator there gave all the residue of his estate to his executors as trustees, in trust out of the rents and profits to establish a school for the maintenance of indigent scholars. This was sup-ported. *Hall*, Justice, dissented, on the ground that there was no equitable devisee who could compel an execution of the trust.

In *Witman* v. *Lee*, (17 *Serg. & Rawle*, 88,) it was de-cided that the statute of 43 Elizabeth did not prevail in

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

Pennsylvania. But the principles adopted by chancery obtained there, not by force of the statute, but as part of their common law. It was immaterial whether the person to take be *in esse* or not, or whether the legatees were at the time of the bequest a corporation capable of taking or not, or how uncertain the object may be, provided there be a discretionary power vested somewhere over the testator's bounty to these objects. That at common law bequests could not be sustained unless the persons to take under the trusts were defined with reasonable certainty. But these would take effect under the statute of Elizabeth.

*Bartlet* v. *King's Executors*, (12 *Mass. Rep.* 537,) is also a strong case.

In the *Orphan Asylum* v. *McCartee*, (9 *Cowen*,) we have the elaborate and decided opinion of Chancellor Jones, not shaken in the court of errors, that where there was a competent trustee, a charitable devise of land should be sustained, and that there was a jurisdiction in this court anterior to the statute of Elizabeth upon the ground of trust. The point in the present case is, however, left open by him. See page 488. The subject has received a very full examination in Vermont. (*Executors of Burr* v. *Smith*, 7 *Vermont Reports*, 241.) The bequest was of a sum of money to be paid to the treasurers of certain specified societies. The societies were unincorporated. The court held that there was a jurisdiction in equity independent of the statute of Elizabeth, and decreed payment of the legacies. One of the judges differed.

In the midst of such conflicting opinions of able jurists—with no decisive authority to which I must bow, it becomes my duty to explore the way myself. I may not even contentedly pursue the path upon which the genius of Marshall, that shining light in the judicial firmament, has shed its lustre.

It is not to be questioned, that by the civil law all bequests, either of real or personal estate, made for the aid of religion or charity, are upheld, however indefinite the object of the gift. It is said that the doctrine of charities came into England through the influence of civilians,

and as a branch of the civil code ; but we must remember that this principle was not the native growth of the civil law, but sprung from the christian religion engrafted upon it. We find its traces from the time that christianity dawned upon the throne of the Cæsars, and never before. In truth the charity taught in the gospel, " that most excellent gift," portrayed by the great apostle in language of unapproachable majesty, is a doctrine which it could not enter into the heart of heathenism to imagine.

1839.

Wright and others
*v.*
Trustées of Meth. Epis. Church.

In the reign of Diocletian a rescript was published— *Collegium si nullo speciali privilegio subnixum sit, hæreditatem capere non posse, dubium non est.* (Cited by Gibbon, vol. ii. p. 355.) The historian observes, that it had been provided by many laws, which were enacted with the same design as our statutes of mortmain, that no real estate should be given or bequeathed to any corporate body, without either a special privilege, or a particular dispensation, from the Emperor or the Senate. He quotes an epistle of Julian, expressing mortification because christian charity supported *not only their own, but the heathen poor.*

The edict of Milan was the first great tribute of Roman power to the influence of christianity, and the source of legalized ecclesiastical possessions. By that edict, (A. D. 313,) all the lands which had been confiscated were restored to the churches, and their title to those which they possessed by indulgence, was sanctioned. (*Eusebius, Eccles. Hist.* lib. x. c. 5.) It speaks of landed property, *ad jus eorum, id est ecclesiarum, non hominum singulorum, pertinentia.* I may observe, that the translation of Professor Cruse, into English, which probably was made from the Greek of Eusebius, does not so clearly convey the meaning. (See his edition, Philad. 1833, p. 428.)(*a*)

---

(*a*) The original edict was in Latin, and is to be found in Lanctantius, De Mortibus Persecutorum, § 48.

The language is : " Et quoniam iidem christiani non in ea loca " tantum ad quae convenire consueverunt, sed alia etiam habuisse

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

Soon afterwards followed the comprehensive edict of Constantine. *Habeat unusquis que licentiam sanctissimo Catholicæ Ecclesiæ, venerabili que concilio, decedens, bonorum quid optant, relinqueri.* (*Cod. Theod.* b. xvi. tit. ii. 4.)

The doctrine that legacies to pious uses were privileged, and exempt from many rules which governed other bequests, became a settled part of the Roman law. Among other points it was decided, that the uncertainty of the object was no objection to their validity. (*Digest Lib.* 30, tit. 1. *Godolpin's Orphan's Legacy*, 18. *Swinburne*, part 1, § 16.) It appears also, that the opinion was held by many jurists, that they were not subject to the Falcidian portion. (2 *Domat*, p. 204, book 4, § 2.)

When we find christianity prevailing in England—its professors high in the councils of the kingdom, and a great judicial office almost universally filled by one of its ministers, we naturally look for the presence of that doctrine which seems to be its offspring. This leads to the inquiry so much disputed, how far there was a legal recognition in the courts of that kingdom, of the canonical doctrine of charities; and where and in what cases, gifts of such a nature could be enforced.

With respect to personal estate, it appears upon the authority of Spelman, that many Saxon lords had made wills of their goods to monasteries. (*Of the Probate of Wills and Testaments*, Posthumous works, p. 128.) By the Legatine Constitutions of Cardinal Ottobini, it was commanded, that the goods of intestates should be distri-

---

"noscuntur ad jus corporis eorum, id est ecclesiarum, non homi-"num singulorum, pertinentia," &c. &c.

Again, the phrase is, "id est corpori et conventiculis eorum reddi "jubebis."

The translation of this edict by Eusebius into Greek, is marked, as a learned scholar informs me, by many errors. He was ill instructed in the Latin language, and the translation of Professor Cruse from the Greek, conveys very feebly the meaning of the original. The transmission into a third language, from a poor translation of the original, is not likely to be very accurate.

buted in *pious uses*, and it was directed, that the bishops make distribution according to the statute made by the prelates with the approbation of the king and barons; meaning, as it should seem, that some statute had been made to warrant such distribution *in pious uses*. This constitution was made in the 52d of Henry III. Bishop Gibson confesses that he cannot discover what statute is here alluded to. (4 *Reeve's Hist. Common Law*, 71.) An attempt was made to remedy the abuses of this system, by a constitution of Archbishop Stratford, in the 10th of Edward III. (4 *Reeves*, 70.)

1839.

Wright and others
*v.*
Trustees of Meth. Epis. Church.

Again, by the statute of 21st Henry. VIII., cap. 6, it was provided, that spiritual persons might take and receive any sum of money or other thing, which by any person dying should be bequeathed to them, or to the high altar of the church.

That gifts of lands for pious and charitable uses also extensively prevailed is proven by the statutes of mortmain themselves. The successive efforts of parliament to release from the grasp of the marble hand of corporations the lands devised to them, show the extent of the practice ; and that the enactments exclusively related to real estate, proves little more than the insignificance of personal property at that period.

But it may be said that the mortmain acts were directed only against *corporations ;* and that these before the statutes of mortmain without license, and subsequently with license from the crown, were always competent to take.

The early mortmain acts were directed against ecclesiastical corporations only. Mr. Kyd (on Corporations, vol. 1, p. 95,) treats the statute of Richard II., (cap. 5,) as first extending the principle to civil corporations. Chief Justice Wilmot, however, says that the prohibition was extended to all secular and lay corporations as well as religious, by the act of 7 Ed. I. st. 2. (Wilmot's Opinions, p. 1.) The language of that act appears sufficiently comprehensive for this purpose. But at any rate, that of Richard II. is decisive. It recites that " because of cities,

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

"boroughs, &c., which had perpetual commonalty, and "others who had perpetual officers, were as perpetual as "people of religion, therefore," &c.

But unincorporated bodies were not subjected to statutory restrictions until the act of 23 Henry VIII., c. 10. By the preamble it appears that feoffments, and assurances, and *wills*, had *been made of trust of land* to the use of the parish churches, fraternities, companies, &c., erected and made of devotion, or by common assent of the people *without any corporation*, or to have obits perpetual, or continual service of a priest, &c., which are as much prejudicial as in case where lands be aliened by mortmain. That statute declared all such assurances, wills, &c. void, and of no effect.

It appears that after the statute of wills went into effect, a question arose whether this act of 23 Henry VIII. was not repealed, so far at least as gifts by will were concerned. The statute of wills had only excepted devises to bodies politic and corporate, and it was urged that unincorporated bodies were hence by implication included in the authority to take. (Porter's case, 1 Coke, 25.) The barons who decided Porter's case did not pass upon this question. But they did determine that the devise was not void under the statute of Henry VIII.; that the act did not take away the good and charitable uses in the case at bar.

I need not enlarge upon this case so constantly cited whenever this question arises. It is sufficient to notice that the devise was upon condition that the grantee should assure and grant the land for the maintenance and continuance of a free school, alms men and alms women for ever; and it was held a good devise.

A case is also cited decided in the 5th of Edward VI., that a feoffment for the use of the poor people was not within the act of 23 Henry VIII., and counsel urged "that " good and charitable uses (not superstitious) *as to relieve* " *poor men, found schools, &c.*, were not made void by said " act, and so hath the statute in common opinion been " always taken. Almost all the lands belonging to towns " or boroughs unincorporated, are conveyed to several in-

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

" habitants and their heirs, upon trust to employ the profits " to such good uses as repairing churches, maintaining the " poor, &c., and no such uses, although they were common "in almost every town, were ever made void by the statute."

Again, in the case of *Montraple* v. *Martin*, (Croke Eliz. 288,) there was an ejectment by a lessee of the heir of an ancestor who had enfeoffed trustees to the use of his will, and devised the premises upon trust that out of the profits the devisees should erect a free school. Their lessee was in possession. It was held that the devise was not within the statute 23 Henry VIII., not being for a superstitious use.

Under this statute, then, it is plain that the law as to pious and charitable devises was unchanged, and that gifts and bequests in trust and for the use of an unincorporated association, if of this nature, continued valid. Thus devises or feoffments to the use of unincorporated bodies, or to the use of the poor people, the most vague and undefined imaginable, were valid at law ; and it is impossible to conceive that what a court of law sustained as legal against an heir, there was no court or power in the kingdom able to enforce for the accomplishment of the objects. This act of Henry VIII., in conformity with the rising genius of the reformation, was aimed at papal superstition, and not at pious uses.

And its principles were sacredly observed in the short and glorious reign of Edward VI., the English Justinian— "that royal and godly child, the flower of the Tudor " name—that serious and holy child, who walked with " Cranmer and Ridley, fit associate for the bishops and "future martyrs of the church." Among those noble laws which have rendered his reign so illustrious, was that respecting Chantries Collegiate. It opens with this fine preamble, teaching its object : " Considering that a great " part of superstition and errors in the christian religion " hath been brought into the minds and estimations of men " by reason of their ignorance of the very true and perfect " salvation through the death of Jesus Christ, and by de- " vising and phantasying vain opinions of purgatory, and " masses satisfactory to be done for them which be de-

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

"parted, which doctrine and vain opinion by nothing is "more upholden than by the abuse of trentals, chanteries, "and other provisions made for the continuance of said "blindness and ignorance; and further considering that "the change and amendment of the same, and convert-"ing them to good and godly uses, as the erection of gram-"mar schools to the education of youth in virtue and "godliness, the further augmenting of the universities, "and better provision for the poor and needy cannot in "this present parliament be conveniently done," &c.  It then provides that all lands, &c., given by any conveyance or will to the finding any priest, &c., to have continuance forever, &c., shall be void.

The construction of this act has been, like that of 23 Henry VIII., to annul superstitious uses, and no others.  It will be useful to advert to some of the decisions.  The leading cases are *Pitt* v. *James*, 1 *Rolles' Rep.* 416, and *Hobart*, 123.  *Lancelot* v. *Adams*, *Croke Car.* 248. *Humphreys* v. *Knight, ibid.* 455.  *Holloway* v. *Watkins*, *Cro. Jac.* 51, and especially *Adams'* and *Lambert's* case, 4 *Coke*, 102. 117.  These authorities show, with some refinements indeed, that a good use, even when united with one that was superstitious, was supported under the statute ; that in general the void use only was adjudged to the king, and not the land, but that was preserved to support the valid gift.  "God forbid," as it is in one case expressed, "that the ill use should swallow up the good." The godly use saved the land, and the king took the profit given to superstition.

For example, *Chibnal* v. *Whitton*, 30 *Eliz.* (4 *Coke*, 109,) B. Horlewyn, by his will in writing, (made 36 Henry VI.,) devised to the Master and Brethren of the Guild of Drapers in London, 34*s.* and 4*d.* yearly, to be employed for the relief of the poor brethren and sisters of the same Guild, and devised such house to the parson and church-wardens of St. Christopher's Parish, and their successors, to pay annually the above 38*s.* and 4*d.*, and also to a chaplain in the Church of St. Christopher's to celebrate masses for his soul, and another sum to celebrate his anniversary,

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

&c. Held, that the land did not go to the king: the good use saved it.

There are many decisions referred to in *Lambert* and *Adams'* case, decided in the court of Augmentations, which I think deserve particular notice. They are omitted in the report of Lord Coke, but will be found in the statement of the case in *Moore's Reports*, p. 651, &c.

*Prune's* case, (4 Ed. VI., *Moore*, 652.) A decree upon the will of John Prune made 5 Henry VI. The devise was to the parson of the parish and his successors, and to four of the most worthy parishioners, to repair the buildings, to provide a chaplain to sing for the benefit of souls at a salary of 10 marks, to provide for an anniversary, with 20 shillings given among the poor, and the residue to repair the tenements and to be disposed of for his soul, in works of charity among the poor. It was decreed that the king should have the land, and the 20 shillings should be paid by the treasurer of augmentations to the poor.

*Cloth Worker's* case, (*Moore*, 654,) devise to give £3 4s. to the poor, a pension for an obit, and the residue to maintain the edifices and ornaments of the church. Adjudged that the king should not have the land; and the reason was because where good uses are mixed with an obit, anniversary, light, or lamp, the land is preserved for the good uses, and the gift to superstition only is nothing.

*Combecton's* case, (*Moore*, 652, 4 Ed. VI.) By a will made 5 Henry IV., Combecton devised to the parson and church-wardens of St. Stephen's to provide out of the profits for a chaplain to celebrate masses for his soul and that of others, and to give 20 nobles annually among the most indigent as well of his mystery of skinners, as of others occupying dwellings in the parish, to perpetually pray for his soul and the souls of others ; to expend £26 annually upon an anniversary for him, and for repairs of the buildings, and the residue of the profits for the ornament of the church, and the poor of the parish. The land was decreed to the king, *with this however*, that his officers should satisfy the repairs and ornaments of the church, and the poor.

In *Russe's* case, (5 Ed. VI., *Moore*, 653,) a similar deci-

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

sion was made. The money which was given to good uses was to be applied by the officers of the king, while the land was adjudged to him.

The statute of Edward VI. and its judicial expositions thus established, that good and godly uses were distinct from superstitious purposes; and as examples of the former, the erection of schools, and succor of the poor and needy, were specified. But further—we have charitable gifts preserved and administered, where no trust remained; where the feoffment and the estate of the feoffees were destroyed, and the land was taken away; and yet the charitable use was held to remain, and the officers of the crown were to apply the bequest. Here then, is the germ of the principle, or rather ancient evidence of the principle, that where there is no trustee, and the objects are indefinite, the crown was to administer. It is also a tribute to the sense of justice, or the fear of revolution, that when the reformation was stayed in the reign of Philip and Mary, a confirmation was made by Cardinal Pole, the Lord Legate of the Pope, of the erection of all cathedrals, and the foundation of all hospitals and schools, made in the time of the past schism, and they were to remain in their then condition firm and established forever. (*Letters of Dispensation of the Legate. Statutes at large*, vol. ii. p. 477.)

The progress of the view I have taken, brings me to the statute of Elizabeth. But some points should be examined, before we can ascertain the true state of the law at the passage of that act. It is important upon this subject, to refer to the rules and statutes respecting wills, and some cases upon their construction.

It is now well understood, that the right of devising lands existed among the Saxons, and was superseded by the prevalence of strict feudalism after the Norman conquest. Still this prohibition was evaded by the adoption of uses from the civil law, and it is certain, that the practice of devising prevailed to a great extent prior to the statute of wills.

The act of uses, (1 Rich. III. cap. 1, 2,) speaks of the last wills of men not being performed, through the preva-

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

lence of secret uses.   The statute of 23 Henry VIII. before cited, speaks of feoffments, wills, and other acts, made to the uses aforesaid.   But especially the great statute of uses, (27 Henry VIII.) recites, " that although by the law " of the realm, lands and tenements be not devisable by " testament, yet they have been conveyed by subtle inven- " tions, sometimes by *nude parolx* and words, sometimes " by writing ;" and by the 11th section of the statute it was recited, " that as doubts might arise as to the validity " of wills theretofore made of lands, &c., it was enacted, " that all manner of true and just wills, theretofore made, " should be taken as effectual in the law, after such form " as they were commonly taken and used at any time " within 40 years next previous to the act, any thing in " the act or the preamble, or any opinion of the common " law to the contrary notwithstanding."   This statute was followed five years afterwards by the first general statute of wills.

It is apparent from the acts thus quoted, that devises of lands extensively prevailed, and were so supported as to effectuate the intention of the makers.   The mode of do- ing this was by a feoffment to the use of the feoffor's last will, and the feoffor being considered as seised of the use, not of the land, could devise it.   Such a devise appears to have been upheld in the courts of common law, as well as enforced in equity. ·

Lord Bacon (*Reading on the Statute of Uses, Works*, vol. ii. p. 423,) says, " For experience of the conveyance, " there was nothing more usual in *obits*, than to will the " use of the land to certain persons and their heirs, so long " as they should pay the charity priests their wages, and in " default of payment, to limit the use to other persons, and " such conveyances are as ancient as Richard II. time."

There is record of a judgment as early as the ninth year of Edward I., a century before the reign of Richard II., proving the same practice, (*Abbreviatio Placitorum*, p. 272, published by the English Record Commission.)   I believe the following is a correct translation.   The jury found that John Swaine and his wife Beatrix, made a feoffment

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

to the use of the last will of said Beatrix. But that she never spoke a word afterwards, and died the next day. And it was therefore adjudged, that the seisin taken of the land was void. See also *The King* v. *Skumshire*, in the sixth of Edward VI., *Dyer*, 74 a. And *Putbury* v. *Trevilian, Dyer*, 142 b. Also, *Saunders' Uses and Trusts*, 73.

Chief Baron Gilbert says, (on *Devises*, p. 6,) that uses were introduced by the clergy, to evade the statutes of mortmain; and as they generally sat in chancery where these uses were solely cognizable, so they suffered them to be disposed of by will, as the *usus fructus* is by the civil law. So in the Doctor and Student, (*Dialogue* 2, c. 22,) it is said that uses were chiefly continued, for the sake of this power of disposing of them by will.

There is another point, and one of great importance, to be noticed. Chief Justice Wilmot says,—" that the alien- " ations in mortmain were never made void, so as to let " in the grantors or their heirs at law; but the law only " gave a right to the mesne lords and the king, to seize them " as forfeited, and therefore if they remitted their right, " the alienation was good. Dispensations by license to " hold in mortmain then arose." (*Wilmot's Opinions*, p. 9.)

If we examine the various statutes in detail, we find that such must be the legal effect of their provisions, except that as to the first of them a question might arise. (36 Henry III. c. 37. 7 Ed. I. 2. 13 Ed. I. st. 1. c. 22. 18 Ed. I. c. 3. 34 Ed. I. 3. 18 Ed. III. st. 3. 18 Rich. II. c. 5.) And as to the most ancient act, the opinion of such a lawyer as the chief justice, must settle its construction. So, in the case of the *Attorney General* v. *Flood*, (1 *Hayes' Irish Ex. Rep.* 130,) the Lord Chief Justice Downes says,—" The prohibition created by the old " statutes of mortmain, was only a qualified one. Alien- " ations in mortmain were considered as forfeitures; which " it was in the power of the lord or person entitled to " waive. The interests of the heir was not considered. " He was bound by the alienation."

Wright and others
v.
Trustees of Meth. Epis. Church.

After this review of the statutes and decisions upon them, prior to the act of 43 Elizabeth, it remains to collect the cases in the court before the act, and to state the judicial opinions subsequently expressed bearing upon the subject. There is a large body of precedents of bills and pleadings printed under the direction of the English record commission of 1821. The commissioners state that very few decrees of that early period have been found. I think the nature of the bills themselves and other pleadings will, in some degree, illustrate this question : although certainly not to be regarded in the same light as decisions, yet their frequent occurrence seems to indicate the existence of a rule. The 43 of Elizabeth was the year 1601.

*Babbington* v. *Gall*, (Chancery Precedents, vol. 1, p. 56. Reign of Henry VI.) A bill complaining that plaintiff's mother had placed 600 marks in the hands of the defendant to found a chantry in the church of St. Peters. It states the gift in trust, and that the plaintiff had got a license from the king to found a chantry. The answer admitted the trust, but stated that if the chantry was not completed in four years, it was to be applied in finding three priests to sing daily in the church, and that he submitted to apply the money as the court should direct.

*Wakering* v. *Bagle*, 1, p. 57, Henry VI. A bill to compel a feoffee in trust, to make an estate in certain lands in Tottenham to the hospital of St. Bartholomew. The bill was by the master of that hospital, recites a license from the king to take lands in mortmain of the yearly value of those given in trust, to the use of the hospital.

*John Lyon and Ellen his wife* v. *John Howe and David Kemp*, reign Edward IV. The bill sets out that the defendants were seized in fee of certain messuages to the use of Richard Merdyke and his heirs. The plaintiff, Ellen, was the former wife of Merdyke. They made an estate to the said Richard and Ellen for their lives. Afterwards, Richard by his last will declared that the premises after the death of Ellen should be sold by the said John and David, and the money should be distributed in works of charity to the health of her soul. And thereupon he

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

declared with his mouth the said deeds of charity, viz: that the said money should be disposed in finding a priest by a year in the church of St. Martins, to the making of St. John's aisle, and the porch of such church, and to the marriage of five poor maidens, and to the amending the high way in the lane behind the Mews. Thomas and David had sold the reversion in the premises, Ellen being still living, and at a much less price than would have been got had they waited. It concludes: " please your good " and gracious lordship, blessedly to consider the sale of " said reversion contrary to the said will."

There was an answer protesting as usual that the bill was not sufficient in law or even in conscience to be answered, but stating that it was uncertain by the will whether they were to sell during Ellen's life or after, and the reason for selling then.

The replication prays that they may answer for the value of the premises as they shall be proved to be, supposing Ellen dead.

*L. A. Vicar of St. Giles, and C. S., &c., Church-war-dens,* v. *Bleyton,* 1599. (Vol. 3, p. 216.) Bill to establish a will. Lands were devised by W. B. to his wife and son the defendant, with remainder over to the plaintiff, in trust for the poor of the parish of St. Giles.

Vol. 3, p. 120. 18 *Holland and Gaff, collectors for the poor of the Parish of Stenyng, and other Inhabitants of Stenyng,* v. *Governor and Fairfield,* (1578,) *J. W.* left to the poor of the parish of Stenyng, the issues and profits of her meadow land, and directed her son, the defendant *G.,* to make disposition of the same after her death as should be for the benefit of the said poor people ; but he endeavors to avoid the same.

A gift to a parish by deed to a charitable use, is void ; but a devise is good, and the church-wardens and over-seers shall take in succession; and in London, the mayor and commonalty. (Duke, 134, citing 40 ass. 26.)

If a man bequeath £300 to three parishes, equally to be let out by the church-wardens of each parish, this is not a gift within the statute of Elizabeth ; but yet the chan-

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

cellor may give remedy by equity in chancery, (Duke, 136.)

In the 11 of Henry VI. a gift was made to the intent to find a chaplain *ad divina celebranda*, until the feoffor or his heirs should procure a foundation. There was no employment till the third year of Edward VI. One Payne purchased the land as a cancelment. The commissioners under the 43 of Elizabeth inquired and found the gift, and decreed the land from Payne to another; but this decree was avoided by the lord chancellor, because the use limited was not a use inquirable within the statute; but the chancellor by his chancery authority may and did decree the land to its first use. Such a gift was not a superstitious use within the 1 Edward VI. (*Duke*, 104.)

One Symons sold certain land to Sir T. Fleming upon confidence to perform a charitable use which he declared by his last will. The *bargain* (*and sale*) was never enrolled, and yet the lord chancellor decreed that the heir should sell the land to be disposed according to the limitation of the use; and this decree was made the 24th of Elizabeth, before the statute of charitable uses, and was made upon ordinary and judicial equity in chancery. (*Duke*, 163.)

*Pember* v. *Kington, Tothill*, 34. The question was, whether money given to maintain a preaching minister be a charitable use. The lord keeper and the judges did decree (*notwithstanding it is not warranted by the statute to be a charitable use*,) that the same shall be paid by the executors to such maintenance. (*Trinity*, 15 *Car.*)

In *Pensterd* v. *Pavier*, (*Tothill*, 34,) £20 per annum was given to a preaching minister: lands and assets were left. Decreed that lands be bought out of the assets to perpetuate it.

*Mayor and Burgesses of Reading* v. *Lane*, 43 Elizabeth, (*Tothill*, 34.) A devise to the poor people maintained in the hospital of the parish of St. Lawrence in Reading forever. Exception that the poor were not capable of that name, for no corporation. Yet because the plaintiff was capable to take lands in mortmain, and did govern

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

the hospital, it was decreed that the defendant should assure the lands to the mayor and burgesses for the maintenance of said hospital.

The inference that this was a case before the statute is very strong. The parliament at which the act was passed commenced on the 27th of October, in the 43d year of the queen, and ended the 19th of December.

*Palmer* v. *Newman*, (1 *Ch. Ca.* 157.) "Upon the hear-"ing it was declared by the court that the king as Pater "Patriæ might inform for any public benefit for charitable "uses before the statute of 30th Elizabeth." There was no parliament in that year. The act 43 Elizabeth is plainly meant.

*Attorney-General* v. *Combe*, 2 *Ch. Ca.* 18. An annual sum was given out of land to support a weekly lecture. The court admitted it not to be within the statute 43 Elizabeth, but decreed it to maintain a catechist to be approved by the bishop. The lord chancellor seems somewhat to rely upon the statute of 1 Ed. VI., made to take away superstitious uses; that the statute of Elizabeth took pattern from it. There was an estate *pur auter vie* part of the land to be charged, which was not devisable. At the close of the case, appearing to be a summary of it, it is said, "a void devise to charity not within 43 Elizabeth decreed. "Lands *pur auter vie* devised to charity decreed though "the charity not within 43 Elizabeth." He refers to a case where a gift was to maintain a superstitious institution so long as the law allowed, turned when the law did abrogate that superstition, to a good use.

The case of *Combes* is cited, (2 *Vernon*, 266,) as of a devise to maintain independent lectures in three market towns; that the gift was sustained upon an information, and the independent lectures changed into catechetical lectures.

*Attorney-General* v. *Matthews*, (2 *Levinz' Rep.* 107,) A. had enfeoffed certain persons in trust, and appointed them to pay £100 per annum to three parishes in London, A, B. & C. for the poor of the parishes; also to certain other charities which had ceased, and the residue he de-

clared they should be seised of to the use of the poor in general forever. The heir at law contested the will in the court of awards. The king had settled the charity in a certain mode by which the gift to the parishes was established, and £80 given to repair St. Paul's, and conveyed accordingly. The residue was given to the heir at law. The commissioners of charities, without regard to the award, settled the whole estate to charitable uses.

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

Lord Keeper Finch :—It being a general charity for the poor, the commissioners have nothing to do with it; but it must be determined by the king himself in this court, upon the information of the attorney-general. This he directed, and upon such information held, that the appointment by the king to St. Paul's, was out of the trust and void, for it was to be for the poor ; that he would consult the king as to the disposition of the residue. And the king directed, that it should go to the maintenance of the mathematical scholars in Christ Church Hospital.

*Clifford* v. *Francis, in Scac.* 1679, (*Freeman*, 330, c. 26,) a surplus was devised to executors, to be disposed of by them in pious uses. The question was, if the commissioners had power of this. The court held, that where money is given to a charity, there the king is the disposer, and the attorney-general should prepare a bill. But if the charity be expressed, there it is in the power of the commissioners of charitable uses. See also, *Anon. Freeman's Rep.* 216, 330 b. approved of by Lord Eldon, in *Mills* v. *Farmer*, 1 *Merivale*, 60.

*Attorney-General* v. *Breton*, 2 *Vesey*, 426. The augmentation of vicarages, is a charity within the 43 Elizabeth. Lord Hardwicke says,—" this is not indeed a " proceeding, by way of commission of charitable uses, " which commission is founded on that statute, but is by " the old way of proceeding in the name of the attorney- " general in this court, for the charity; but that pro- " ceeding is not confined to cases considered as charities " before the statutes of charitable uses, but all others are " taken to be within the extensiveness of the proceeding " in the name of the attorney-general." Lord Maccles-

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

field, in 2 *P. Wms.* 118, says,—" So in the case of charity, " the king, *pro bono publico,* has an original right to su- " perintend the care thereof, so that abstracted from the " statute of Elizabeth, and antecedent to it, as well as " since, it has been every day's practice, to file informations " in chancery in the attorney-general's name, for the es- " tablishment of charities." And Lord Hardwicke, (2 *Atk.* 550, and 2 *Vesey,* 37,) says,—" It is true, that an infor- " mation in the name of the attorney-general, as an officer " of the crown, was not a head of the statute of charitable " uses, because that original jurisdiction was exercised in " this court before ; but that was always in cases now " provided for by the statute, that is, charities at large, not " properly and regularly provided for in charters of the " crown."

In *Merrill* v. *Lawson,* (4 *Viner,* 500,) there was a bill to establish a will, and to perform several trusts, some of them relating to charities. The bill was by some trustees against the others and the *cestuis que trust;* an objection was made for want of parties ; that several charities being given by the will to persons uncertain, not capable of sue- ing or being sued, the attorney-general ought to have been a party. The objection was overruled. The Lord Chancellor Parker considered that the attorney-general was a proper party where there was no trustee, and the devise was direct to charitable uses.

In *the Attorney-General* v. *The Mayor of Dublin,* (1 *Bligh's Rep.* 347,) Lord Redesdale says, " we are referred " to the statute of Elizabeth with respect to charitable uses " as creating a new law upon that subject. That statute " has only created a new jurisdiction. It created no new " law. It created a new and ancillary jurisdiction. The " lord chancellor might reverse or affirm what the com- " missioners had done, or make such order as he might " think fit, preserving the jurisdiction of the court of chan- " cery as it existed before the passing of the statute, and " there is no doubt that by information of the attorney- " general, the same thing might be done. That is a right " of prerogative. The king as *parens patriæ* had a right

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

" to call upon the tribunals of justice by his proper officer
" to see that justice was done to incompetent persons."

I may here notice a case in the Irish exchequer very
carefully argued, and the report of which has been but
lately published. *Attorney-General* v. *Flood*, (*Hayes'
Exch. Rep.* 611.) The case came before Lord Manners
in 1817, who called in the aid of the Chief Justice Downes.
The actual point settled was precisely that determined in
the court of errors in the Orphan Asylum cause. The
devise was direct to Trinity College and their successors,
to maintain a perpetual professorship for the native Erse
or Irish language. A statute of wills similar to the Eng-
lish act prevails in Ireland. The devise was held void at
law and not to be supported in equity.

The chief justice observes—" if the testator had devised
" the estate to a trustee capable of taking for the benefit of
" the college, or for purposes not collegiate, a plain separa-
" tion of the legal estate from the trust would be manifest.
" But here I cannot separate the trusts from the legal estate
" in point of interest. Both the legal and equitable estates
" seem in my mind to go together." Lord Manners, how-
ever, speaks, (page 630;) of the court of chancery having
always exercised jurisdiction in matters of charity derived
from the crown as *parens patriæ.* There are certainly
expressions in his opinion tending to support the view of
its jurisdiction being derived from the statute of Eliza-
beth, (p. 636;) but confining them to the matter before
him, they are consistent with the more enlarged notion
of its power. Thus, where he says, " that so by this pro-
" ceeding every devise to a corporation for charity, though
" void at law, would be good in equity, and this had been
" done in England, not by any inherent authority of the
" court, but under the sanction of 13 Elizabeth," he plainly
refers to the case before him.

There is one position of the chancellor which should be
noticed. He says, " that if a feoffment had been made to
" trustees for the purposes contained in this will, it would
" have been void under the 15 Richard II. cap. V., as an
" evasion of the statutes of mortmain." Now this position

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

is inaccurate, because it does not contain the qualification, that the feoffment would be void as to the king alone, and a license would sustain it. Again, the very enactment of the statute shows the existence of the practice; and that it was supported, and not avoided by former laws; and from the authorities I have stated, it is clear that in England but for that statute, and where this statute does not exist, feoffments to trustees for such purposes were plainly valid.

In reviewing these authorities, we find several decided before the statute expressly upon the general power of the court; and of these, one was in substance a devise to the mayor and burgesses of a parish to support poor people in the hospital of the parish. Next we find some case after the statute, in which the uses declared were not charities within it, in which, as in the leading case from Levinz, the commissioners had nothing to do with the bequest, and yet the gifts were supported, or when undefined, were applied by the direction of the king.

Now if the jurisdiction of this court was founded upon the statute, how is it possible to imagine a case of jurisdiction in which the commissioners could not be resorted to? The assumption of power by original bill in cases within the act does not affect this argument; for there would be still a right to resort to the inquiry by the commissioners. It would be a concurrent remedy. Nor does the doctrine of cases within the equity but not within the letter affect it; for the commissioners would have power in the one case as much as in the other. It is then in my opinion a point not to be disputed, that there was a jurisdiction in the court of chancery over charities anterior to the statute, and that such jurisdiction was of the most unlimited character.

I have brought down my examination in this historical order to the statute of Elizabeth. It is needless to repeat the positions drawn from its title and preamble, that it was intended to regulate the appropriation of prior gifts to charitable purposes as well as subsequent. It authorizes the appointment of certain officers, to examine into

all such gifts, because of frauds, breaches of trusts, and negligence, in relation to them. It empowers the lord chancellor or lord keeper to appoint those officers. It provides that the lord chancellor, &c., shall take order for the execution of these decrees; and that if any person is aggrieved by their decision, he may apply to the lord chancellor for redress, who may annul, alter, or enlarge the decrees as shall stand in equity.

1839.

Wright and others v. Trustees of Meth. Epis. Church.

It may first be inquired, whether any changes in the law were affected by this statute. By force of the words *limit* and *appoint*, it operated largely in favor of charities. Thus it repealed as to them the statute *de donis*, and made a devise by tenant in tail valid without a fine or recovery. (*Collinson's case,* 2 *Rolle,* 317. *Hobart,* 136. *Precedents in Chancery,* 270. *Attorney-General* v. *Rye,* 2 *Vernon,* 453. See 3 *Atk.* 149.) It supplied the defect of a surrender of a copy-hold, to the use of a will. (*Rivett's case, Moore,* 890.) But chiefly it so far repealed the statute of wills, as to render devises to corporations for charitable uses valid. They operated as appointments, not as devises. (*Hobart,* 136. 1 *Wm. Black.* 91. *Den* v. *Newman,* 1 *Levinz,* 284. *Lovelass on Wills,* 256.) It was held also, to operate so as to dispense with a written will. (*Duke on Charitable Uses,* 81. *Stodart's case.* But see *Jenner* v. *Harper,* 1 *P. Wms.* 247.) The statute of frauds, however, being later than that of Elizabeth, repealed it so far as to render the attestation of three witnesses necessary. (*Preced. in Chancery,* 270, 3 *Atk.* 149.) With respect to unincorporated bodies, it is not disputed that gifts to them were protected by the act. The case of *Weelker* v. *Childs,* (*Ambler,* 524,) is very clear upon this head.

It strikes my mind as demonstrable, that the statute of Elizabeth did not establish a single new principle in the law of charities, although it obviated the effects of some prior statutes. Did it sanction a gift or devise for the benefit of unincorporated companies for pious purposes? The statute of 23 Henry VIII. recognizes the existence of the same to such, as well as to superstitious

1839.

Wright and
others
v.
Trustees of
Meth. Epis.
Church.

purposes, and saves the former. Did it repeal by force of the words *limit and appoint*, the exception in the statute of wills? That exception was a branch of the acts of mortmain. Before the statute, a corporation might take by devise against every one, except the king, and against him by his license. After the act, a devise was put upon the same footing as a conveyance. For that, a license was necessary; and the only change wrought in the law was, that between the statute of wills, and the statute of Elizabeth, a devise even to a corporation licensed generally to hold in mortmain, was not valid. Did it, or the decisions under it, sanction a devise or gift to the most vague purposes of charity without a trustee, and remit the matter to the crown to distribute? The same is declared to have been done before the statute; but further, such bequest was sustained in this court upon the bill of overseers of the poor merely, or of any person whom the court would deem proper distributers of the bounty. Again, before the statute, devises to charities were upheld, through the doctrine of a feoffment to the use of a will and the devisability of a use; and as to a defective surrender of a copyhold, Lord Northington says : " All defective conveyances " to charitable purposes were aided before the act." (1 *Eden*, 14.)

With respect to the great body of decisions upon the statute, it appears to me that there is a principle to be found in them all, entirely consistent with a jurisdiction in this court independent of it. It has been adopted as defining what are to be regarded as charitable objects which this court will protect. It is an enumeration of those objects which are to be deemed charities. It has been taken as a specification of what are charitable uses; but it leaves the point of jurisdiction, the origin of that jurisdiction, and the mode of exercising it wholly untouched.

The court has said, that what are specified in the statute or are within its spirit are charities, and none other. These alone will it now enforce. It is a judicial construction of what is a charity. But the power to enforce such charity

1839.

Wright and others v. Trustees of Meth. Epis. Church.

is in the court by virtue of its original constitution, independent of the statute. It would exist had the statute never been passed, or if it were now repealed.

This view is consistent with the leading cases of *Morris* v. *The Bishops of Dunham*, and *James* v. *Allen*. " The signification of charity in this court," says the Master of the Rolls, " is derived chiefly from the statute. " Those purposes are considered charitable which that " statute enumerates, or which by analogy are deemed " within its spirit and intendment."

In the late case of *Baker* v. *Setton*, (1 *Keene's Reports*, 23,) a bequest of the residue of personal estate to executors in trust, to pay and dispose of the same to such religious and charitable institutions and purposes within the kingdom of England, as in the opinion of the major part of them shall be deemed proper, was held valid.

Then with respect to the mode of enforcing the rule, it seems now admitted in England that if there is no trustee, and the object is wholly undefined, the king administers the charity under his sign manual as *parens patriæ*. In the case of *Morrill* v. *Lawson*, (4 *Viner's Abr.* 500,) Lord Chancellor Parker says, " that when a bill is " brought to establish a charity given by will to persons " uncertain and incapable of suing or being sued, the suit " must be in the name of the attorney-general *ex necessi-* " *tate rei;* because there are no certain persons entitled to " it who can sue in their own names."

There is ample authority in our own country to establish that the states now represent that peculiar branch of the royal power as *parens patriæ*. There may occur cases in which the information of the attorney-general would be the appropriate remedy. But where the trustees or executors apply themselves for the direction of the court, it seems to me, the question as to the mode of proceeding is free from any difficulty. This was the course pursued in the case in Vermont.

The result of my examinations is, that the gift of a share of the surplus to the Friends' Yearly Meeting is

1839.

Wright and
others
*v.*
Trustees of
Meth. Epis.
Church.

valid, and that payment to the defendant Thomas Everitt, the treasurer, will be a full protection to the executors.

As already stated the rents accrued between the death of the testator and the sale cannot go to the institutions, but belong to the heir at law, if there is any such competent to take. The defendant Archibald Campbell claims as a native born citizen, and Alexander Campbell as a naturalized citizen, naturalized before the testator's death. Their father is still living; was the cousin of the testator, and is an alien.

The case of *M'Creesy* v. *Somerville,* (9 *Wheaton,* 354,) settles the law so decisively as to preclude any further examination. I am also informed that the supreme court has lately made the same determination. The alienage of the living father intercepts the descent. The consequence is, that the land escheated until the execution of the power, and the rents must belong to the state.

The decree will be entered from the following heads :

1. The costs and counsel fees of the complainants and the costs of the other parties to be paid out of the funds.

2. The rents and profits, after deducting the rateable proportion of such costs chargeable thereupon to be paid in such manner as the attorney-general shall direct.

3. The surplus in hand, after deducting its proportion of such costs and fees, to be divided among the several societies in proportion to the pecuniary legacies given them by the original will. The several shares to be paid to the treasurers thereof named in the pleadings, or to such persons respectively as shall at the time of such payment fill the office of treasurer.

4. The share or proportion payable to the Methodist Society that meets in the Meeting-house in John-street to be paid to the Treasurer of the trustees for the Corporation of the Methodist Episcopal Church in the city of New York, but for the sole use and benefit of that branch of the said corporation which meets for public worship in John-street.

5. The legacy to Euphemia Murray to be paid to her children.